Filed 8/26/16  Certified for Publication 9/13/16 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ANGEL L. MENDEZ et al., Individually and as Trustees, etc.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>RANCHO VALENCIA RESORT PARTNERS, LLC,<br><br>    Defendant and Respondent. | D067899<br><br><br><br>(Super. Ct. No. 37-2012-00053798-CU-PO-NC) |

APPEAL from a judgment of the Superior Court of San Diego County, William S. Dato, Judge.  Affirmed.

Burkhardt & Larson, Philip Burkhardt and Francisco Garcia, Jr. for Plaintiffs and Appellants.

Cooley, Steven M. Strauss and Dennis C. Crovella for Defendant and Respondent.

I.

INTRODUCTION

Plaintiffs Angel and Linda Mendez[1] appeal a judgment in favor of defendant

Rancho Valencia Resort Partners, LLC. At the conclusion of a bench trial, the trial court

entered judgment in favor of defendant on plaintiffs' action for private nuisance.

The case arises from a dispute over the reasonableness of the level of noise

generated during outdoor festivities held at the Rancho Valencia Resort (the Resort).

Plaintiffs, who share a property line with the Resort, became frustrated with the noise

emanating from the Resort when it hosted outdoor events on a lawn created for that

purpose. Plaintiffs filed suit, alleging that the Resort's outdoor events constituted a

private nuisance, and seeking to enjoin the Resort from continuing to create noise that

would travel onto plaintiffs' property and disturb them there.

The trial court appreciated the difficulties inherent in this situation, but after a trial

on the merits, concluded that the Resort's outdoor events did not amount to a private

nuisance. The trial court explained:

> "The history of this case reflects the principle that where neighbor
> disputes are concerned, a judicial resolution is rarely the preferable
> solution. This is because a court decision can only articulate a rule
> that marks a line between what one party is responsible for, and what
> it is not responsible for. Such a black-and-white approach is ill-
> suited to the multi-faceted subtleties that attend a neighbor
> relationship, which often require an ongoing series of give-and-take

---

[1] The Mendezes filed this action in their individual capacities, as well as in their capacities as trustees of the Mendez Family Trust dated November 1, 2002. For ease of reference and clarity, we will refer to each plaintiff by his or her first name when referring to them individually.

2

compromises on a variety of subjects. Once a legal rule is applied to the facts of a particular case, there is often little wiggle room left to smooth the frictions that inevitably arise between parties who continue to share a common property boundary.

"In this case, plaintiffs elected not to pursue other avenues for addressing the dispute. In particular, they abandoned their earlier attempts to obtain relief through available County administrative procedures. They likewise chose not to join other homeowners in the neighborhood, who continued to work informally with the resort owners despite not being completely satisfied with the progress. By filing this lawsuit and taking the matter to trial, plaintiffs effectively drew a line in the sand. But forced to choose, the Court concludes that the noise in this case is not so substantial and unreasonable as to fall on the side of the line that would require issuance of the injunction sought by plaintiffs."

Despite plaintiffs' contentions that the trial court failed to properly address purported violations of various San Diego County ordinances, we conclude that plaintiffs have demonstrated no reversible error in the trial court's decision. We therefore affirm the judgment.

II.

FACTUAL AND PROCEDURAL BACKGROUND

The Resort, a five-star resort property in the Rancho Santa Fe area of San Diego County, first opened in 1989. The property occupies approximately 45 acres in an otherwise residential neighborhood, consisting of large homes on large lots. A central building on the property houses a guest reception area, restaurant, bar, ballroom and terrace balcony. To one side of this building is an area called the Croquet Lawn, which consists of an expanse of grass. This area can accommodate large outdoor events at the Resort, such as weddings.

3

Plaintiffs own a 6,800 square foot residence located on a lot that borders the Resort property. Plaintiffs' home is approximately 600 feet from the Croquet Lawn. Plaintiffs were aware of the Resort and its location in reference to their home at the time they purchased the home in 2000. Within weeks of buying the home, plaintiffs became aware that the Resort held outdoor events on the Croquet Lawn.

Beginning in 2004, Linda began complaining to San Diego County officials regarding noise coming from the Resort property. In a March 2004 email, Linda complained that the Resort was " 'not authorized to have outdoor events with amplified music or voices, which could adversely affect the neighborhood.' " Linda cited Resort Services Regulation section 6403 (Resort Services section 6403), which is contained in the County's Zoning Ordinance, in complaining that the Resort " 'can not [sic] use a "public address system at such a volume as to allow words to be understood outside the boundaries of the lot or parcel on which the activity is located." ' "

The record does not contain information as to precisely how Linda's 2004 complaint was resolved. Linda testified that she never received a response from the County, but documentary evidence demonstrates that when Linda again complained in 2006, a code enforcement officer responded that Linda's complaint regarding the " 'same issues' " had been investigated in 2004. When Linda continued to press the issue, the code enforcement officer referred Linda to a 2004 email that had been sent to Linda, which stated that the enforcement department had determined " 'that weddings and other

4

outdoor events are an allowable accessory use to a resort.' "[2]  In 2007, the County issued a formal administrative decision regarding Linda's complaint that the Resort was in violation of the zoning ordinance, concluding that " 'wedding ceremonies are a reasonable and expected accessory use in a resort' " and that the Resort was not in violation of the Major Use Permit issued to it in 1986.

The record indicates that Linda took no further action to appeal the County's administrative zoning decision.  Linda also did not take any action with respect to the County's noise ordinance, despite her concern that events at the Resort were in violation of noise restrictions.  Linda explained that she was not as troubled by the noise from the Resort at that time because the frequency of outdoor events at the Resort had diminished.

In May 2010, defendant purchased the Resort from its previous owners.  Upon learning about a proposed renovation of the property, plaintiffs and other neighbors became concerned that there would be more frequent outdoor events at the Resort.  In November 2011, there was a meeting attended by four sets of neighbors to the Resort and David Essakow, one of the partners who owned the Resort.  Two of the four sets of neighbors were principally concerned with events taking place on the Croquet Lawn.  Essakow told the group that he could not make any commitments before speaking with the Resort's lawyers.  The group agreed to meet again approximately 30 days later.

In January 2012, the Resort closed for renovations.  During the eight-month renovation period, representatives of the Resort met with surrounding neighbors in

---

[2]     At the time, Linda did not indicate in response to the code enforcement officer that she had not received the previous email referred to by the code enforcement officer.

several follow-up meetings. The Resort's representatives indicated to the neighbors that they intended to include noise mitigation measures as part of the renovations. Plaintiffs did not attend these meetings because they apparently disagreed with the approach that their neighbors were taking in addressing concerns about the Resort. Instead, plaintiffs filed this lawsuit on May 22, 2012, claiming that sound from events at the Resort amounted to a private nuisance.

The Resort reopened in September 2012. The renovations that had taken place at the property included a number of measures designed to mitigate the effect of noise from the Croquet Lawn events on neighboring property owners, including plaintiffs. The Resort hired a consulting company, URS Corporation (URS) to analyze sound at the Resort and come up with methods to attempt to address excess sound. For example, the Resort mandated that all outdoor events end at 10:00 p.m. It was determined that a stage area located on the Croquet Lawn would be positioned so that sounds would be directed away from plaintiffs' property. In addition, the Resort purchased a distributive sound system and a removable sound barrier to be installed behind the stage, which would be used during amplified events. Further, regulations at the Resort required that members of live bands use earpieces rather than utilize speakers directed back toward the band.

The Resort began hosting wedding receptions and other outdoor events on the Croquet Lawn when it reopened in September 2012. The Resort continued to adjust its noise mitigation efforts and add new ones as more events were held. For example, sometime after the renovations were completed, a sub-woofer system was added to reduce the level of bass sounds.

6

In addition to taking these noise mitigation measures, the Resort implemented a sound monitoring system for all Croquet Lawn events. Sound decibel monitors were installed along the property line between the Resort and plaintiffs' property. For events in which amplified sound was being used, the Resort utilized the services of URS to monitor real time sound level readings. URS would communicate with an employee of a different company, Sound Image, which operated the Resort's sound system for events. Using this system, when URS would detect sound levels that exceeded noise levels permitted by the County's noise ordinance, a URS employee would direct a Sound Image employee to reduce the volume of the sound system.

After the Resort reopened, plaintiffs had sound monitors placed on a second story deck at their residence. Plaintiffs' sound monitors were thus positioned at a higher level than the sound monitors utilized by the Resort at the property line. Plaintiffs sought a preliminary injunction to enjoin the Resort from "generating any noise whatsoever on [the Resort's property] in excess of the statutory limits imposed by San Diego County Code of Regulatory Ordinances Section 36.404." In support of their motion for a preliminary injunction, plaintiffs presented to the trial court evidence that the decibel readings from their sound monitors at times exceeded the noise levels permitted by the County's noise ordinance.[3] Based on this evidence, in December 2012, the trial court issued a preliminary injunction prohibiting the Resort " 'from generating any noise

_____

[3] As we explain further in our discussion, the County's noise ordinance generally makes it unlawful for any person to cause or allow the creation of any noise that exceeds the one-hour average of 50 decibels per hour between the hours of 7:00 a.m. and 10:00 p.m. in the area in which the Resort and the Mendez residence are located.

7

whatsoever on defendants' property located at 5926 Valencia Circle, Rancho Santa Fe, California in excess of the statutory limits imposed by San Diego County Code of Regulatory Ordinances Section 36.404 and 36.414.' "[4]

In response to the preliminary injunction, the Resort declined to book events on the Croquet Lawn until May 2013. In the meantime, the Resort continued to take measures intended to mitigate the noise effects from events that the Resort planned to hold on the Croquet Lawn. For example, after January 2013, the Resort tested its distributive sound system a number of times prior to holding events. In May 2013, the Resort again began holding events on the Croquet Lawn that involved some form of amplified sound. The majority of outdoor events held at the Resort are weddings, which often occur during the summer months. The total duration of these events averaged approximately eight hours per month.

Despite the hosting of outdoor events at the Resort after the preliminary injunction was in place, plaintiffs never filed a motion claiming that the Resort had violated the preliminary injunction.

In their complaint against the Resort, plaintiffs asserted four causes of action: (1) private nuisance; (2) negligence; (3) intentional infliction of emotional distress; and (4) negligent infliction of emotional distress. All of plaintiffs' claims arose from their

_____

4    In seeking the preliminary injunction, plaintiffs did not rely on Resort Services section 6403. In addition, plaintiffs did not argue that the Resort violated Noise Ordinance section 36.414(c)(3) on the ground that the device used for the production or reproduction of sound was located "in" a structure—i.e., that the Croquet Lawn itself or a stage on the Croquet Lawn constituted a "structure" for purposes of the ordinance.

contention that the noise generated from the Resort's outdoor events constituted a private nuisance.

The litigation between the parties progressed to a bench trial. At trial, plaintiffs focused on their nuisance claim. Plaintiffs sought a permanent injunction preventing the Resort from using any outdoor sound amplification system or mechanical music from drums, horns, or other instruments. In seeking an injunction for a private nuisance, plaintiffs relied, in part, on alleged violations of San Diego County ordinances, including regulations pertaining to resorts, specifically, found in the County's Zoning Ordinance, and regulations included in the County's noise ordinance, which is part of the County's Regulatory Ordinances.

The court heard testimony from 13 witnesses, including plaintiffs, certain of plaintiffs' neighbors, two experts for the plaintiffs, a URS consultant, and representatives of the Resort. The court also listened to clips edited from audio recordings of specific events, selected by plaintiffs' attorney. In addition, the trial judge personally visited both the Resort, as well as plaintiffs' home, during a wedding reception held on the Croquet Lawn, at which the Resort utilized its amplified sound system (the court's site visit). The judge listened to the sounds that could be heard from plaintiffs' balcony.[5]

---

[5]    Because the court was concerned that the noise generated from this event might have been intentionally dampened if the Resort was made aware of the court's site visit, the court ordered the parties and counsel not to advise anyone about the court's site visit in advance. In addition, the court was able to compare sound measurements from the event on the night of the court's site visit with sound measurements from events on other dates; the sound measurements were comparable.

The evidence demonstrated that in 2014, there was at least one event held every weekend in July and August, and at least 17 events held between January 2014 and September 12, 2014. There were more than 30 outdoor events held on the Croquet Lawn between the beginning of 2013 and fall of 2014, when the trial took place.

At trial, Linda testified that it was her belief that the Resort "is not allowed to host outdoor events" at all. Linda testified that she became upset whenever she could hear sound from an event at the Resort. She acknowledged, however, that outdoor events took place for, at most, approximately eight hours per month, and conceded that she did not always hear noise during the hours in which the events took place.

Linda acknowledged that in 2014, she began taking notes of her perceptions of the noise emanating from the events at the Resort. The trial court had access to Linda's notes. Linda had taken notes about the event that was held on the night of the court's site visit. The trial court found a marked contrast between (a) Linda's subjective expressions of what she experienced, as reflected in her notes, and (b) the objective sound measurements from that night and the court's own observations about the noise emanating from the event.

Linda testified that the event held during the court's site visit was "one of the quietest" that the Resort had hosted. She reflected on her notes from the evening, and testified that although the sound was fairly typical of other events between the 7:00 pm and 8:00 p.m. hours, at some point "things were turned down," and then she "could hardly hear the voices." However, the objective sound measurements, which were not in dispute, demonstrated that the event registered between 46 and 48 decibels on average

10

per hour. These sound measurements were "typical of the sound levels for other Croquet Lawn events about which Linda Mendez complained."

Angel testified that he could not identify a single Croquet Lawn event that had caused him to initiate suit against the Resort. He acknowledged that his wife's stress about the noise contributed to his own stress, and conceded that he had testified at his deposition that at least with respect to one particular event, any stress he had suffered had resulted from the fact that Linda " 'was very upset and distraught and it upsets [the] harmony of the home.' "[6] Angel also admitted that he was not claiming to have suffered emotional distress resulting from any specific event at the Resort during 2014. Linda acknowledged that Angel was not as bothered by the noise from the Resort as she was, and conceded that he had testified that only "a handful of events" had ever disturbed him.

After the bench trial, the court issued a 26-page statement of decision in which it concluded that an injunction pertaining to the events on the Resort's Croquet Lawn was not warranted. Specifically, the court found that "the outdoor events in question—typically wedding receptions and similar festivities—have not occasioned any systematic violation of applicable local regulations," and "[t]o the extent there have been any violations, they are not so substantial and unreasonable as to constitute a private nuisance that requires issuance of an injunction." The trial court gave considerable weight to the evidence that demonstrated that "at no time did Croquet Lawn events hosted by [the

---

[6] Angel also admitted that his ability to sleep was generally impacted by the fact that he and Linda were " 'up late talking about [the noise] instead of resting comfortably.' "

11

Resort] generate noise exceeding the statutory limit [in the County's noise ordinance]."[7]

The trial court therefore found in favor of the Resort on plaintiffs' private nuisance cause of action, and further determined that plaintiffs' "ancillary claims provide no independent basis for relief."

Plaintiffs filed a timely notice of appeal from the trial court's judgment.

III.

DISCUSSION

Plaintiffs contend that the trial court erred in two respects in declining to issue an injunction prohibiting the Resort from emitting noise from its property that is audible to plaintiffs on their property. Specifically, plaintiffs contend that the trial court (1) erroneously failed to enjoin the Resort's purported violations of Resort Services section 6403, which is part of the County's Zoning Ordinance, and (2) erroneously failed to enjoin the Resort's purported violations of the County's Noise Ordinance. They request that this court order the trial court to issue "a permanent injunction prohibiting the Resort from violating either the Zoning Ordinance or Noise Ordinance."

We conclude that the trial court did not err in its determination of the issues raised in this action and therefore affirm the judgment entered in favor of the Resort.

---

[7] The court also determined that "if there was a technical violation [of the County's noise ordinance average sound limits], it would have been slight, infrequent, and would have occurred despite the good faith efforts of the Resort to assure compliance with the Noise Ordinance."

12

A.  *Legal standards on review*

The standards under which we review the trial court's judgment are well settled. " 'A permanent injunction is a determination on the merits that a plaintiff has prevailed on a cause of action . . . against a defendant and that equitable relief is appropriate.' [Citation.]  The grant or denial of a permanent injunction rests within the trial court's sound discretion and will not be disturbed on appeal absent a showing of a clear abuse of discretion." (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 390 (*Horsford*); see also *Shapiro v. San Diego City Council* (2002) 96 Cal.App.4th 904, 912 (*Shapiro*) [the decision to issue a permanent injunction will not be disturbed on appeal in the absence of a showing of clear abuse of discretion by the trial court].)

" '[T]o the extent the trial court had to review the evidence to resolve disputed factual issues, and draw inferences from the presented facts [in exercising its discretion with respect to the granting or denying of a permanent injunction], [we] review such factual findings under a substantial evidence standard.' [Citation.]  We resolve all factual conflicts and questions of credibility in favor of the prevailing party and indulge all reasonable inferences to support the trial court's order." (*Horsford*, *supra*, 132 Cal.App.4th at p. 390.)

However, we exercise independent judgment when addressing a pure question of law, such as the interpretation and application of a statute where the underlying facts are not in dispute.  (*Shapiro*, *supra*, 96 Cal.App.4th at p. 912.)

13

Whether the Resort's activities have resulted in "any systematic violation" of the regulations in question is a mixed question of law and fact. To the extent that the trial court's determination that there were no such violations relies on factual findings, we review those findings for substantial evidence. To the extent that the court's determination in this regard is premised on the court's interpretation of the relevant regulations, we review such an interpretation de novo. Finally, with respect to the trial court's conclusion that no injunction is appropriate, we review that conclusion for an abuse of discretion.

B. *Relevant law regarding private nuisances*

Plaintiffs sought an injunction against the Resort based on their cause of action asserting that the Resort's outdoor events in which amplified sound is utilized constitute a private nuisance. The legal standards applicable to nuisance claims are therefore relevant to this appeal.

In 1872, the California Legislature codified a number of common law principles regarding the law of nuisance. (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1104.) For example, the Legislature defined a "nuisance" in Civil Code section 3479 as anything that is "injurious to health, . . . or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway."

A nuisance is considered a "public nuisance" when it "affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." (Civ. Code, § 3480.) A "private nuisance" is defined to include any nuisance not covered by the definition of a public nuisance (Civ. Code, § 3481), and also includes some public nuisances. (47 Cal.Jur.3d (2010) Nuisances, § 27, p. 303 [a nuisance may be both public and private under certain circumstances].) "In other words, it is possible for a nuisance to be public and, from the perspective of individuals who suffer an interference with their use and enjoyment of land, to be private as well." (*Adams v. MHC Colony Park L.P.* (2014) 224 Cal.App.4th 601, 610 (*Adams*).)

"A private nuisance cause of action requires the plaintiff to prove an injury specifically referable to the use and enjoyment of his or her land." (*Adams*, *supra*, 224 Cal.App.4th at p. 610.) Pursuant to Civil Code section 3501, a plaintiff seeking to remedy a *private nuisance* is limited to a civil action or abatement.[8]

" 'Unlike public nuisance, which is an interference with the rights of the community at large, private nuisance is a civil wrong based on disturbance of rights in land. . . . [T]o proceed on a private nuisance theory the plaintiff must prove an injury specifically referable to the use and enjoyment of his or her land. The injury, however,

---

[8]    "A private person may maintain an action for a public nuisance, if it is specially injurious to himself, but not otherwise." (Civ. Code, § 3493.) The damage suffered by the private party must be different in kind and not merely in degree from that suffered by other members of the public. (*Institoris v. City of Los Angeles* (1989) 210 Cal.App.3d 10, 21.)

15

need not be different in kind from that suffered by the general public.' " (*Monks v. City of Rancho Palos Verdes* (2008) 167 Cal.App.4th 263, 302 (*Monks*).)

" 'Examples of interferences with the use and enjoyment of land actionable under a private nuisance theory are legion. "So long as the interference is substantial and unreasonable, and such as would be offensive or inconvenient to the normal person, virtually any disturbance of the enjoyment of the property may amount to a nuisance." . . . An interference need not directly damage the land or prevent its use to constitute a nuisance; private plaintiffs have successfully maintained nuisance actions against airports for interferences caused by noise, smoke and vibrations from flights over their homes . . . and against a sewage treatment plant for interference caused by noxious odors.' " (*Monks*, *supra*, 167 Cal.App.4th at p. 302.)

In *San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 938 (*San Diego Gas & Electric Co*.), the Supreme Court outlined the elements of an action for private nuisance. First, the plaintiff must prove an interference with his use and enjoyment of his property. (*Ibid.*) Second, "the invasion of the plaintiff's interest in the use and enjoyment of the land [must be] *substantial*, i.e., that it cause[s] the plaintiff to suffer 'substantial actual damage.' " (*Ibid.*) Third," '[t]he interference with the protected interest must not only be substantial, but it must also be unreasonable' [citation], i.e., it must be 'of such a nature, duration or amount as to constitute unreasonable interference with the use and enjoyment of the land.' " (*Ibid.*)

The requirements of *substantial damage* and *unreasonableness* are not inconsequential. These requirements stem from the law's recognition that:

16

" 'Life in organized society and especially in populous communities involves an unavoidable clash of individual interests. Practically all human activities unless carried on in a wilderness interfere to some extent with others or involve some risk of interference, and these interferences range from mere trifling annoyances to serious harms. It is an obvious truth that each individual in a community must put up with a certain amount of annoyance, inconvenience and interference and must take a certain amount of risk in order that all may get on together. The very existence of organized society depends upon the principle of "give and take, live and let live," and *therefore the law of torts does not attempt to impose liability or shift the loss in every case in which one person's conduct has some detrimental effect on another.* Liability . . . is imposed in those cases in which the harm or risk to one is greater than he ought to be required to bear under the circumstances, at least without compensation.' " (*San Diego Gas & Electric Co.*, *supra*, 13 Cal.4th at pp. 937-938, quoting Rest.2d Torts, § 822, com. g, p. 112, italics added.)

Both elements are to be judged by an objective standard. Thus, with respect to the substantial damage element, the degree of harm is to be measured by the "effect . . . the invasion [would] have on persons of normal health and sensibilities living in the same community." (*San Diego Gas & Electric Co.*, *supra*, 13 Cal.4th at p. 938.) " 'If normal persons in that locality would not be substantially annoyed or disturbed by the situation, then the invasion is not a significant one, even though the idiosyncrasies of the particular plaintiff may make it unendurable to him.' " (*Ibid.*) With respect to the unreasonableness element, "[t]he primary test for determining whether the invasion is unreasonable is whether the gravity of the harm outweighs the social utility of the defendant's conduct, taking a number of factors into account. [Citation.] Again the standard is objective: the question is not whether the particular plaintiff found the invasion unreasonable, but 'whether reasonable persons generally, looking at the whole situation impartially and

17

objectively, would consider it unreasonable.' [Citation.] . . . 'Fundamentally, the unreasonableness of intentional invasions is a problem of relative values to be determined by the trier of fact in each case in the light of all the circumstances of that case.' " (*Id.* at pp. 938-939.)

As is apparent from the above standards, the elements of substantial damage and unreasonableness necessary to making out a claim of private nuisance are questions of fact that are determined by considering all of the circumstances of the case. (*San Diego Gas & Electric Co.*, *supra*, 13 Cal.4th at pp. 938-939.)

It is clear that "[e]xcessive and inappropriate noise may under certain circumstances constitute an interference with the present enjoyment of land amounting to a nuisance." (*Schild v. Rubin* (1991) 232 Cal.App.3d 755, 764 (*Schild*), internal fn. omitted, citing *Wilson v. Interlake Steel Co.* (1982) 32 Cal.3d 229, 232 [permitting plaintiffs to move forward with nuisance action, but not trespass action, in case involving complaint regarding noise from steel fabricating plant]; *Morton v. Superior Court* (1954) 124 Cal.App.2d 577, 586 [injunction preventing quarry from operating was too broad to address nuisances from traffic, excessive noise and dust; trial court should have enjoined the objectionable practices and imposed conditions to correct them]; *Wilms v. Hand* (1951) 101 Cal.App.2d 811, 812, 815-816 [trial court did not abuse its discretion in issuing preliminary injunction to prevent dogs in dog hospital from " 'annoying and disturbing the peace and comfort' " of plaintiffs, owners of neighboring motel].) However, it is equally clear that "*not every activity* which is 'offensive to the senses [and]

18

interferes with the comfortable enjoyment of life' (Civ. Code, § 3479) is a nuisance."

(*Schild*, *supra*, at p. 764, italics added.)

C. *Trial court did not err in failing to enjoin the purported "Violation of the Zoning Ordinance"*

Plaintiffs' first contend that they are entitled to equitable relief because they are "affected by the Resort's unlawful use of its property."  The purported "unlawful use of [the Resort's] property" is the violation of Resort Services section 6403.  Resort Services section 6403 is part of the County's Resort Services Regulations, which are found in Part Six, "General Regulations," of the San Diego County Zoning Ordinance (Zoning Ordinance).  Section 6400 of the Resort Services Regulations provides the title and purpose of these specific provisions:  "The provisions of Section 6400 through 6449, inclusive, shall be known as the Resort Service Regulations.  The purpose of these provisions is to ensure that transient habitation uses providing resort services meet minimum standards of habitability and do not adversely impact surrounding property."

Resort Services section 6403 contains a provision addressing the use of public address systems and lighting at a resort facility, providing in full:

"6403 IMPACT ON SURROUNDING PROPERTY.

"a. Public Address Systems.  Public address systems shall not be used by resort services at such a volume as to allow words to be understood outside the boundaries of the lot or parcel on which the activity is located.

"b. Outdoor Lighting. Outdoor lighting used by resort services uses shall be adjusted to reflect light away from roads and driveways and from adjoining property, except that a bona fide system of street lights may be used if it does not cause light to be reflected on adjoining property."

The trial court made a finding that "the public address system used by the Resort on the Croquet Law operates at a volume that allows words to be understood outside the boundaries of the Rancho Valencia property."[9]  Plaintiffs seize on this finding to assert that the trial court "improperly overlooked the clear violation of the Zoning Ordinance simply because 'the evidence demonstrates that the Resort has complied with the County Noise Ordinance.' "  Plaintiffs insist that the trial court failed to independently assess whether the violation of the County's Zoning Ordinance, as opposed to the County's Noise Ordinance, constituted a nuisance.  In making this argument, plaintiffs suggest that any violation of the Zoning Ordinance constitutes a nuisance per se.  Plaintiffs' analysis is incorrect.

Plaintiffs rely on section 7703, subdivision (e) of the Zoning Ordinance (Zoning Ordinance section 7703) to support their contention that the court's finding of a violation of Resort Services section 6403 required the court to issue a permanent injunction

---

[9]     The trial court noted that during the court's site visit, the court "could make out words from certain of the speeches at the reception."

prohibiting the Resort from using its amplified sound system on its property.[10] Zoning

Ordinance section 7703, subdivision (e) provides:

> "Violation is A Public Nuisance.  Any building or structure erected,
> constructed, altered or maintained and/or any use of property
> contrary to the provisions of these regulations shall be and the same
> is hereby declared to be unlawful and a public nuisance, and any
> failure, refusal or neglect to obtain a permit as required by the terms
> of this ordinance shall be prima facie evidence of the fact that a
> nuisance has been committed in connection with the erection,
> construction, alteration or maintenance of any building or structure
> erected, constructed, altered or maintained or used contrary to the
> provisions of this ordinance.  The public nuisance may be abated in
> accordance with the Uniform Public Nuisance Abatement
> Procedures contained in Chapter 2, Division 6, Title 1 (commencing
> with Section 16.201) of the San Diego County Code or County
> Counsel shall, upon order of the Board of Supervisors immediately
> commence necessary proceedings for the abatement, removal and/or
> enjoinment thereof in the manner provided by law."

As is clear from this provision, Zoning Ordinance section 7703 does not declare

any violation of the Zoning Ordinance to be a *private nuisance*, nor does it provide

private individuals with a right to enforce provisions of the Zoning Ordinance through

private equitable actions.  Rather, Zoning Ordinance section 7703, subdivision (e)

identifies the method by which a violation of the Zoning Ordinance is to be addressed—

---

[10]     Plaintiffs assert that the trial court "swept away section 7703 in a footnote refusing
to recognize the misuse of the public address system on the Resort property as a 'use of
property contrary to the provisions of these regulations' and rejecting the propriety of a
private lawsuit to abate a nuisance."  However, plaintiffs did not raise Zoning Ordinance
section 7703 in their complaint, their motion for a preliminary injunction, or in their trial
briefing.  Rather, plaintiffs apparently raised the question of the effect of Zoning
Ordinance section 7703 only in their objections to the court's proposed statement of
decision.  As a result, the trial court addressed plaintiffs' objection to the proposed
statement of decision by way of a footnote in the final statement of decision.  As we shall
discuss, the trial court's analysis of the effect of Zoning Ordinance section 7703 in the
court's footnote demonstrates no error.

21

i.e., in accordance with the Uniform Public Nuisance Abatement Procedures contained in the San Diego County Code or by way of County Counsel commencing proceedings to abate or enjoin the nuisance "in the manner provided by law."  The provision does not authorize private persons to bring a private civil action to enforce the Zoning Ordinance.

Nevertheless, plaintiffs suggest that because the County of San Diego has "clearly set the legislative policy here," it is "the *court's* responsibility to enforce that policy" (italics added), presumably in plaintiff's private nuisance action, because, according to plaintiffs, "[t]he County does not have the authority to issue an injunction."  However, the County clearly has a method of abating a public nuisance if it should so desire, pursuant to its authority to engage in abatement procedures specified in the San Diego County Code.  For example, Zoning Ordinance section 7703, subdivision (e) refers to the Uniform Public Nuisance Abatement Procedures (the UPNAP), found in San Diego County Code of Regulatory Ordinances, Title 1, Division 6, Chapter 2.  The UPNAP begins with the following introductory language:

> "This chapter shall be known and cited as the 'Public Nuisance Abatement Procedure.'  It is enacted pursuant to Government Code Section 25845 and is intended to establish an administrative procedure for the abatement of a public nuisance resulting from a violation of any statute, regulation or ordinance the County enforces."  (San Diego County Code of Reg. Ord., § 16.201.)

Pursuant to the UPNAP, a " 'County Abatement Officer' " is the "County officer responsible for enforcement of the County ordinances being violated and who declares a violation to be a public nuisance."  (San Diego County Code of Reg. Ord., § 16.202(a).) The UPNAP also provides a detailed procedure for instituting and proceeding with an

22

administrative abatement of a violation that is deemed to be a public nuisance. (See San Diego County Code of Reg. Ord., §§ 16.202.5-16.218.)

Further, as Zoning Ordinance section 7703 acknowledges, a county or municipality seeking to enforce the policies set forth in its ordinances clearly also has the authority *to seek an injunction itself* if it believes that the policies it has set are being violated and other methods of remediation have failed. (See, e.g., *County of Tulare v. Nunes* (2013) 215 Cal.App.4th 1188, 1193 [county brought action for injunctive relief seeking to require defendants to discontinue nonconforming use of the property]; *County of Butte v. Bach* (1985) 172 Cal.App.3d 848, 854 [county filed action to enjoin defendant from using house in violation of zoning ordinance].)

Thus, even assuming that a violation of Resort Services section 6403 constitutes a public nuisance pursuant to Zoning Ordinance section 7703, plaintiffs' suggestion that the court has a responsibility to enjoin any violation of a zoning ordinance raised in a private nuisance action because there is no other method to "enforce [the County's legislative] policy," is baseless. The relevant ordinances do not leave a vacuum of remedies for the violation of the Zoning Ordinance, such that the only available remedy is for a trial court to enjoin such a violation of the Zoning Ordinance through a private nuisance action filed by private individuals.

Further, plaintiffs' contention that they are "*entitled* to . . . equitable relief" as a result of the Resort's violation of Resort Services section 6403 fails to recognize the nature of the claim that plaintiffs brought against the Resort—i.e., a claim for private nuisance. While Zoning Ordinance section 7703 states that unlawful use of property

23

constitutes a *public* nuisance, it does not declare that any violation of the Zoning Ordinance is a per se *private* nuisance entitling a private party to an injunction. Absent any such statement that would make a violation of Resort Services section 6403 a private nuisance, a private party seeking to rely on a violation of the Zoning Ordinance as the basis for a private nuisance cause of action must still establish that the violation in question meets the elements of a private nuisance.

Plaintiffs' reliance on *Sapiro v. Frisbie* (1928) 93 Cal.App. 299 (*Sapiro*) for the proposition that they are *entitled* to a private cause of action based on a violation of a zoning ordinance, and are thereby entitled to an injunction to abate the zoning ordinance violation, is misplaced. In *Sapiro*, the court considered whether a private individual could obtain injunctive relief and damages against a funeral home that was operating without a permit in a residentially zoned district. (*Id.* at p. 301.) The *Sapiro* court concluded that the plaintiffs could state such an action, *apart* from any claim that the funeral home constituted a nuisance:

> "[W]e emphasize the proposition that the right of the plaintiff herein to claim and recover damages for any damage they may have sustained or may sustain as a result of the acts of the defendants in doing that which the ordinance prohibits, proceeds, *not from or upon the theory that the acts complained of constitute a common-law nuisance*, but *upon the theory that, the defendants having violated a right specially given to the plaintiffs by the law*, and thus have caused damage to their real property, the latter are entitled to have redressed by way of compensatory relief the wrong so committed." (*Id.* at p. 311, italics added.)

We are not persuaded that a local ordinance's regulation of certain uses of property, together with the application of the maxim that all wrongs have a remedy, is a

24

proper basis for a claim of an implied right of action in favor of private individuals in situations in which an ordinance, such as the one at issue here, specifically provides for enforcement by public officials. Indeed, more recent cases that have considered the question have determined that a zoning violation *cannot* be enjoined by a private individual in the absence of proof that the violation also constitutes a private nuisance, has caused the individual special damages of a kind different from the general public, or that the ordinance was enacted to protect the particular welfare of a community of which the private individual is a member. (See, e.g., *Major v. Silna* (2005) 134 Cal.App.4th 1485, 1498 ["citizens of a municipality ordinarily have limited standing to enjoin violations of a municipal ordinance, absent authorization in the ordinance itself," and thus individuals must show specialized personal injury in order to enjoin violation of ordinance]; *Pacifica Homeowners' Assn. v. Wesley Palms Retirement Community* (1986) 178 Cal.App.3d 1147, 1152-1153 ["The law allows a private individual to enjoin a zoning violation as a nuisance when the individual suffers a 'special injury to himself in person or property of a character different in kind from that suffered by the general public' " or "the individual is a 'member of the community for whose particular welfare the ordinance was enacted' "]; *Taliaferro v. Salyer* (1958) 162 Cal.App.2d 685, 691 ["[A] violation [of a local building codes] would not necessarily give a private individual a cause of action therefor. In order to state a cause of action based upon a violation of the building code, plaintiff must show that he has suffered some exceptional damage other than that suffered by the public generally"]; *Stegner v. Bahr & Ledoyen, Inc.* (1954) 126 Cal.App.2d 220, 231 ["Failing to prove that the operation of the quarry constitutes a

25

nuisance and failing to prove that the operation of the quarry results in legal injury to them, plaintiffs are in effect seeking, solely and simply, to enforce a penal law. No such remedy is available to them"]; *McIvor v. Mercer-Fraser Co*. (1946) 76 Cal.App.2d 247, 253 ["The record discloses evidence that appellants were guilty of willfully creating and maintaining a dangerous and deleterious condition on their premises, thereby substantially impairing the use and enjoyment of respondents' adjoining premises"]; *Carter v. Chotiner* (1930) 210 Cal. 288, 291-292 [in action seeking to enjoin the operation of a cemetery where local ordinance required a permit that defendants did not possess, mere violation of ordinance was not a sufficient basis on which to grant the plaintiffs injunctive relief: "It is elementary that violation of a penal ordinance does not of itself create a private nuisance *per se*, and it is likewise eleme[n]tary that in the absence of special injury an injunction will not be granted on the application of a private individual merely to prevent violation of a penal statute"].)

After considering the enforcement provisions of the Zoning Ordinance, and considering other cases holding that a zoning violation cannot be enjoined by a private individual through a private nuisance action in the absence of proof that the violation constitutes a private nuisance, we reject the argument that *Sapiro* establishes that plaintiffs are necessarily entitled to an injunction on the basis of any demonstration of a violation of the Zoning Ordinance.[11]

---

11      Plaintiffs brought a claim for a private nuisance and sought to rely on a demonstration of a violation of Resort Services section 6603 in order to prove their claim for private nuisance. They did not bring an action seeking to enforce Resort Services

Thus, we conclude that even in the face of a finding of the existence of violations of Resort Services section 6403 on the part of the Resort by its use of a public address system that allows words to be understood outside the boundaries of the Resort's property, plaintiffs still must demonstrate that the use of this public address system in this way constitutes an interference with plaintiffs' use and enjoyment of their land that is

---

section 6603. As a result, in order to prevail, they were required to establish the elements of a private nuisance at trial.

Although it might also be possible for a private individual to bring an action seeking an injunction to enforce a provision of a zoning ordinance if that individual can either demonstrate that he or she has suffered a special injury that is different in kind from that suffered by the general public, or that he or she "is a 'member of the community for whose particular welfare the ordinance was enacted' " (*Pacifica Homeowners' Assn. v. Wesley Palms Retirement Community*, *supra*, 178 Cal.App.3d at pp. 1152-1153), plaintiffs did not bring such an action, nor did they attempt to demonstrate in the trial court that they either suffered any injury that is different *in kind*, and not different *in degree*, from that suffered by the general public as a result of the violation of Resort Services section 6603, or that they are members of a community for whom Resort Services section 6603 was enacted.

In their reply briefing and at oral argument, plaintiffs cited Government Code section 25132 in support of their contention that they are entitled to bring a private civil action to enforce a county ordinance, and to suggest that the trial court should have granted them an injunction based on the court's finding of a violation of Resort Services section 6603, even absent any "unique interest in enforcing the law." Government Code section 25132, subdivision (a) provides: "(a) violation of a county ordinance is a misdemeanor unless by ordinance it is made an infraction. The violation of a county ordinance may be prosecuted by county authorities in the name of the people of the State of California, or redressed by civil action." However, even assuming that the statute means what plaintiffs contend it means (i.e., that, like a private attorney general statute, it authorizes any private individual to file an action to enforce a county ordinance), the fact remains that plaintiffs did *not* bring an action to privately enforce a county ordinance. Instead, plaintiffs pled and attempted to prove a cause of action for private nuisance, based in part on asserted violations of various county ordinances, including Resort Services section 6603. The existence of a statutory provision that, according to plaintiffs, grants them the right to privately enforce a county ordinance does not eliminate the need for a plaintiff who seeks to privately enforce a county ordinance to plead and prove *that* cause of action, and thereby give the opposing party the opportunity to defend against that claim and the court the opportunity to address that claim.

27

*substantial and unreasonable*. Again, both the substantiality and unreasonableness of the claimed interference are to be judged by objective standards—i.e., what effect would the invasion have on persons of normal health and sensibilities. (See *Monks*, *supra*, 167 Cal.App.4th at p. 303.) In this regard, the trial court determined that the use of the public address system in a manner that permitted words to be heard on plaintiffs' property during certain outdoor events held on the Croquet Lawn was not so substantial and unreasonable, to a person of normal sensitivities, to amount to a private nuisance. Plaintiffs do not contend that this portion of the trial court's decision was erroneous; rather, their position on appeal is that the Resort's intermittent violation of Resort Services section 6403, as contained in the Zoning Ordinance, constitutes a per se private nuisance that *entitles* them to an injunction. For the reasons stated, the statutory framework does not support plaintiffs' position. We therefore reject plaintiffs' contention that the court is obligated, in this private nuisance action, to abate the alleged public nuisance stemming from the court's finding that the Resort has technically violated Resort Services section 6403.

D. *The trial court did not err in declining to "Enjoin the Resort's Violation of the Noise Ordinance"*

Plaintiffs also suggest that the trial court erred in declining to issue an injunction based on the court's analysis of the Noise Ordinance contained in Title 3, Division 6, Chapter 4 of the San Diego County Code of Regulatory Ordinances (Noise Ordinance).

The trial court made a determination that even though the "noise from Croquet Lawn events is clearly audible to the Mendezes and other neighbors in the surrounding

28

area," the noise "*is not unreasonably disturbing* within the meaning of the County Noise Ordinance." (Italics added.) In other words, the court found that the noises emanating from the Resort's property during outdoor events held on the Croquet Lawn do not constitute a violation of the Noise Ordinance. Plaintiffs argue that the trial court was wrong in concluding that the noise from the Resort's outdoor events does not violate the Noise Ordinance and contend that if the trial court had properly interpreted and applied Noise Ordinance section 36.414, it would have issued an injunction in their favor prohibiting the Resort from violating the Noise Ordinance.

Plaintiffs make two arguments with respect to the trial court's application of Noise Ordinance section 36.414 (Section 36.414) to this case. Plaintiffs first assert that the trial court erred in its interpretation of Section 36.414, subdivision (c)(3). Section 36.414, subdivision (c)(3) provides that it is "a prima facie violation of section 36.414(c)(2)(A) if a device for the production or reproduction of sound that is being operated, used or played is plainly audible at a distance of 50 feet or more from the building, structure or vehicle in which it is located." According to plaintiffs, the Resort's use of an amplification system on the Croquet Lawn necessarily constitutes a violation of the Noise Ordinance because the sound is audible at a distance more than 50 feet from either the stage, or the Croquet Lawn itself. They appear to contend that because the noise from the events on the Croquet Lawn comes from a device used to reproduce sound, and is audible more than 50 feet from where the device is housed, they are necessarily entitled to an injunction to abate this violation of the Noise Ordinance.

Plaintiffs next assert that the trial court "improperly refused to apply [the] general noise prohibition of Section 36.414(a)" (formatting omitted). According to plaintiffs, the trial court's focus on the Resort's compliance with the sound limits provided for in section 36.404 of the Noise Ordinance (Section 36.404)—i.e., the fact that the noise from the Resort remained under 50 decibels per hour on average—resulted in the court "eviscerat[ing] the General Noise Prohibitions of section 36.414." Plaintiffs argue that the trial court inappropriately focused solely on the level of noise generated by the Resort's outdoor festivities held on the Croquet Lawn, and failed to give adequate consideration to the additional factors on the "list of 10 nonexclusive factors to be considered when determining whether noise from any source, mechanically produced or not, violates section 36.414." According to plaintiffs, the trial court's finding that plaintiffs' neighbors who testified at trial " 'were disturbed by the noise from the events on the Croquet Lawn.' . . . mandates a ruling in favor of [plaintiffs]" because it demonstrates that the noise was " 'disturbing, excessive, or offensive' " in violation of Section 36.414, subdivision (c)(2)(A).

1. *Relevant provisions of the Noise Ordinance*

Because plaintiffs' argument is premised on various provisions of the Noise Ordinance, it is useful to set forth some of the relevant provisions of this portion of the County's Regulatory Ordinances.

Section 36.401 of the Noise Ordinance provides the basic policy behind the Noise Ordinance:

"Disturbing, excessive or offensive noise interferes with a person's right to enjoy life and property and is detrimental to the public health and safety. Every person is entitled to an environment free of annoying and harmful noise. The purpose of this chapter is to regulate noise in the unincorporated area of the County to promote the public health, comfort and convenience of the County's inhabitants and its visitors."

Noise Ordinance section 36.402 provides definitions applicable to the chapter. This provision defines " '[d]isturbing, excessive or offensive noise' " as "any sound or noise that" either "[e]ndangers the health or safety of any person" or "[c]auses discomfort or annoyance to a person of normal sensitivity." (Noise Ordinance, § 36.402, subd. (g).) It defines " '[p]lainly audible' " to mean "any sound that can be detected by a person using his or her unaided hearing faculties." (*Id.*, subd. (o).)

Section 36.404, titled "General Sound Level Limits," (some capitalization and boldface omitted) contains a table that sets forth objective sound level measurements proscribed for various areas of the County. It provides in relevant part: "Except as provided in section 36.409 of this chapter, it shall be unlawful for any person to cause or allow the creation of any noise, which exceeds the one-hour average sound level limits in Table 36.404, when the one-hour average sound level is measured at the property line of the property on which the noise is produced or at any location on a property that is receiving the noise." The parties agree that, pursuant to Section 36.404, the applicable

31

one-hour average for the property at issue in this case is 50 decibels between the hours of 7:00 a.m. and 10:00 p.m.[12]

Sections 36.405 through 36.413 of the Noise Ordinance provide for noise regulation of specific activities and/or locations.[13]

Section 36.414 is titled "General Noise Prohibitions," (some capitalization and boldface omitted) and appears to codify general nuisance standards. It provides, in relevant part:

> "In addition to the general limitations on sound levels in section 36.404, the following additional prohibitions shall apply:
>
> "(a) It shall be unlawful for a person to make, continue or cause to be made or continued a disturbing, excessive or offensive noise.
>
> "(b) The characteristics and conditions which should be considered in determining whether a violation of this section has been committed include, but are not limited to, the following:
>
>> "(1) The level of noise.
>>
>> "(2) Whether the nature of the noise is usual or unusual.
>>
>> "(3) Whether the origin of the noise is natural or unnatural.

---

[12]   Subdivision (d) of Section 36.404 provides for a slight deviation from this 50-decibel requirement in circumstances in which "the measured ambient noise level exceeds the applicable limit in Table 36.404." In such an instance, "the allowable one-hour average sound level shall be the one-hour average ambient noise level, plus three decibels. The ambient noise level shall be measured when the alleged noise violation source is not operating."

[13]   For example, titles of these sections include "Repairing, Rebuilding or Testing Motor Vehicles" (§ 36.405), "Refuse Vehicles & Parking Lot Sweepers" (§ 36.407), "Sound Level Limitations on Construction Equipment" (§ 36.409), "Signal Device for Food Trucks" (§ 36.412), and "Multiple Family Dwelling Units" (§ 36.413). (Some capitalization and boldface omitted.)

"(4)  The ambient noise level.

"(5)  The proximity of the noise to a place where someone sleeps.

"(6)  The nature and zoning of the area within which the noise emanates and where it is received.

"(7)  The time of day the noise occurs.

"(8)  The duration of the noise.

"(9)  Whether the noise is recurrent, intermittent or constant.

"(10)  Whether the noise is produced by a commercial or noncommercial activity.

"(c)  The following acts, among others, are declared to be disturbing, excessive and offensive noises that violate this chapter and are unlawful:

"[¶] . . . [¶]

"(2)  Using, operating, playing or allowing another person to use[,] operate or play, a radio, musical instrument, phonograph, television set or other device for the production or reproduction of sound:

"(A)  That disturbs the peace, quiet and comfort of persons of normal sensitivity residing in the area.

"(B)  That exceeds the levels in section 36.404 when measured at a distance of twenty-five feet from a device operating in a public right-of-way.

"(C)  That exceeds the levels in section 36.404 when measured at a distance of twenty-five feet from a device for the production or reproduction of sound operated in a County park unless a permit has been obtained from the County Parks and Recreation Department specifying the time, location and other conditions under which amplified sound may be allowed within a County park.  A person using, operating or playing a device for the production or

33

reproduction of sound in a County park, however, shall not exceed a level of 90 decibels when measured 50 feet from the source or exceed the levels in section 36.404 when measured at the park boundary. Subsection 36.414 (c)(2)(C) shall be enforced by the Parks and Recreation Department.

"(3) It shall be a prima facie violation of section 36.414(c)(2)(A) if a device for the production or reproduction of sound that is being operated, used or played is plainly audible at a distance of 50 feet or more from the building, structure or vehicle in which it is located."

The Noise Ordinance also provides that the County sheriff is to have "primary responsibility for enforcing sections 36.405, 36.407, 36.411, 36.412, 36.413, 36.414 and 36.415." (Noise Ordinance, § 36.418.) A "noise control officer shall have primary responsibility for enforcing all other sections of this chapter." (*Ibid.*) The provision also clarifies that "a person authorized to enforce this chapter may arrest a person without a warrant if he or she has reasonable cause to believe that the person has committed a misdemeanor in his or her presence that violates this chapter." (*Ibid.*)

In a section entitled "Additional Remedies," (some capitalization and boldface omitted) the Noise Ordinance clarifies that "[t]he noise control officer may order a person to cease violating any section of this chapter that the noise control officer enforces. The noise control officer may, in addition to using any remedy provided in section 11.121 of this code, summarily abate a public nuisance caused by any act that violates this chapter if the noise control officer determines the[re] is an immediate threat to the health or safety of any person." (Noise Ordinance, § 36.419.)

34

2. *The trial court did not err in interpreting Section 36.414, subdivision (c)(3); however, even if this court accepted plaintiffs' interpretation of the meaning of "structure," a finding of a violation is not required*

Plaintiffs assert that the trial court erred in interpreting Section 36.414, subdivision (c)(3), which states that "[i]t shall be a prima facie violation of section 36.414(c)(2)(A) if a device for the production or reproduction of sound that is being operated, used or played is plainly audible at a distance of 50 feet or more from the building, structure or vehicle in which it is located."[14]  According to plaintiffs, the reference to the term "structure" in the ordinance should be interpreted to include either the stage or the Croquet Lawn itself, such that the Resort's use of an amplification system on the Croquet Lawn would constitute a violation of the Noise Ordinance if sound from the amplification system is audible at a distance more than 50 feet from either the stage or the Croquet Lawn.

"In interpreting an ordinance or a voter initiative, we rely on the same rules of statutory construction applicable to statutes."  (*Woodland Park Management, LLC v. City*

---

[14]    For ease of reference, we restate the language of Section 36.414, subdivision (c)(2)(A):

> "(c) The following acts, among others, are declared to be disturbing, excessive and offensive noises that violate this chapter and are unlawful:
>
> "[¶] . . . [¶]
>
> "(2) Using, operating, playing or allowing another person to use[,] operate or play, a radio, musical instrument, phonograph, television set or other device for the production or reproduction of sound:
>
> > "(A) That disturbs the peace, quiet and comfort of persons of normal sensitivity residing in the area."

35

*of East Palo Alto Rent Stabilization Bd.* (2010) 181 Cal.App.4th 915, 919.) " 'The primary duty of a court when interpreting a statute is to give effect to the intent of the Legislature, so as to effectuate the purpose of the law. [Citation.] To determine intent, courts turn first to the words themselves, giving them their ordinary and generally accepted meaning. [Citation.] If the language permits more than one reasonable interpretation, the court then looks to extrinsic aids, such as the object to be achieved and the evil to be remedied by the statute, the legislative history, public policy, and the statutory scheme of which the statute is a part.' " (*Id.* at p. 920.)

Plaintiffs assert that it was error for the trial court to conclude that the term "structure" in Section 36.414, subdivision (c)(3) impliedly refers to a " 'contained enclosure,' " such that the referenced device must be *inside* of the structure. Plaintiffs suggest that the trial court placed "undue emphasis on the word 'in,' and no emphasis on the stated purpose of the Ordinance," and in doing so "effectively t[ook] the word 'structure' out of the ordinance." Plaintiffs suggest that in interpreting this provision of the Noise Ordinance, we should borrow the definitions of "building" and "structure" from the County's Zoning Ordinance, which defines both terms. They point out that the definitions of these terms in the Zoning Ordinance do not require that either a building or a structure be enclosed. Section 1110 of the Zoning Ordinance defines a "building" as "[a]ny structure used or intended for supporting or sheltering any use or occupancy" and defines a "structure" as "[t]hat which is built or constructed, an edifice or building of any kind, or any piece of work artificially built up or composed of parts joined together in some definite manner." Plaintiffs argue that pursuant to the Zoning Ordinance definition

36

of a "structure," the stage used on the Croquet Lawn is a building or a structure, and the Croquet Lawn, which was constructed by the Resort, is a structure.[15]

The Resort counters that plaintiffs' proffered construction of Section 36.414, subdivision (c)(3) is unreasonable, and points out that it ignores the words " 'in which it [the device] is located.' "  They contend that plaintiffs' position that the word "in" must be interpreted to mean "on" when one considers the "purpose" of the Noise Ordinance, is incorrect.  They further point out that if one were to apply plaintiffs' interpretation, the provision's inclusion of the word "building" would be rendered meaningless, since, pursuant to the definition of a "building" in the Zoning Ordinance, any building is also a "structure."  If these definitions were applied to the Noise Ordinance, the Resort contends, then there would be no need for the Noise Ordinance to include the word "building," since any building would be necessarily included in the term "structure."  The Resort suggests that the trial court's interpretation, which gives meaning to the word "in" and does not render the phrase "building" superfluous, is the more reasonable interpretation.

We conclude that the Resort offers the more reasonable interpretation of what Section 36.414, subdivision (c)(3) is attempting to address.  A fundamental principle of statutory construction is that "interpretations which render any part of a statute superfluous are to be avoided."  (*Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1207.)  Despite plaintiffs' contention that giving effect to the word "in" as it

---

15    Notably, the definition of a "building" under the Zoning Ordinance makes reference to it being a "structure."

is ordinarily understood places "undue emphasis" on that word and somehow takes "the word 'structure' out of the ordinance," it is possible to give effect to both the word "in" *and* the word "structure," while also giving due regard to the underlying purpose of the Noise Ordinance, which is to "regulate noise in the unincorporated area of the County to promote the public health, comfort and convenience of the County's inhabitants and its visitors." (Noise Ordinance, § 36.401.)

Section 36.414, subdivision (c)(3) speaks specifically about the use of a "device" that produces or reproduces sound. This is a direct reference to the devices referred to in Section 36.414, subdivision (c)(2)(A), which include "a radio, musical instrument, phonograph, television set or other device for the production or reproduction of sound." Subdivision (c)(3) of Section 36.414 makes it a "prima facie violation" of subdivision (c)(2)(A) of the same section (i.e., a violation of the provision making it unlawful to use, operate, play, etc., one of the listed devices in a manner that "disturbs the peace, quiet and comfort of persons of normal sensitivity") if the device being used, operated, played, etc., is "plainly audible at a distance of 50 feet or more from the building, structure or vehicle *in which* it [(the device)] is located." (Italics added.)

Given the types of devices listed—i.e., radios, televisions, and musical instruments—as well as the list of the places "in which" such devices are considered located—i.e., buildings, structures, and vehicles, the more reasonable interpretation of this provision is that it is intended to prohibit the use of one of these devices at such a significant volume inside a contained enclosure that the sound nevertheless escapes the enclosure and can be heard 50 feet away from an outer edge of the enclosure. In giving

38

the ordinance this interpretation, we give meaning to the County's use of the phrase "in which it [the device] is located," and we further acknowledge that the term "structure" in this provision (despite being defined in a very particular manner in Section 1110 of the Zoning Ordinance) is best understood as a general descriptor for a constructed enclosure that is otherwise not typically referred to as a "building," such as a residence, other dwelling home, or possibly a temporary office or other constructed edifice. (See, e.g., Zoning Ordinance, § 6952 [setbacks to be measured from "existing *residences or buildings* occupied by civic use types" (italics added)]; Zoning Ordinance, § 6156, subd. (b) ["One detached poolhouse, art or music studio, or recreation room is permitted, provided the *structure* meets main building setbacks" (italics added.)]; City of San Diego Municipal Code, Chapter 9 [Chapter is titled "Building, Housing and Sign Regulations," suggesting that the term "building" need not necessarily refer to a residence or dwelling].)[16]

We acknowledge that this interpretation may not address potentially injurious noise-creating conduct by individuals who use sound producing or reproducing devices outside. However, in our view, through this ordinance, the County was specifically

---

[16] The Resort also points out that the 50-foot restriction as applied to "structures" under the definition that plaintiffs proffer would be impractical and unreasonable. As the Resort points out, 50 feet is less than 18 yards. If the word "structure" is understood to be *anything* constructed, as plaintiffs' suggest, then a sound producing/reproducing device used from a podium, or even a courtroom bench, would be subject to the 50-foot limitation. It seems patently unreasonable that the County intended to apply this limitation to devices used to produce or reproduce sound that could be heard beyond 50 feet from "any piece of work artificially built up or composed of parts joined together in some definite manner," such as a stage, podium, or even a courtroom bench.

attempting to address situations in which individuals who are inside of homes, buildings, or vehicles using radios or other devices to produce sounds that escape the contained enclosure in which they are located. We conclude that the trial court did not err in interpreting section 36.414, subdivision (c)(3) of the Noise Ordinance in addressing plaintiffs' complaint in this case.

There is an additional problem with plaintiffs' position regarding the proper analysis of Noise Ordinance section 36.414. Plaintiffs assume that if their interpretation of the meaning of "structure" in Section 35.414, subdivision (c)(3) is given credit, then they have *necessarily* established the existence of a violation and would thus be entitled to enjoin the violation of the Noise Ordinance.[17] We are not convinced that plaintiffs would have established the existence of a Noise Ordinance violation, even if we were to conclude that plaintiffs' interpretation of Section 36.414, subdivision (c)(3) is the more reasonable interpretation. This is because Section 36.414, subdivision (c)(3) states that it "shall be a *prima facie* violation" of a prior regulatory provision if a device used to produce or reproduce sound creates sound that is audible at a distance of 50 feet or more from "the building, structure or vehicle in which it is located." (Italics added.) Although

---

[17]    Plaintiffs only specify the nature of the error that they are asserting with respect to the court's interpretation of Section 36.414, subdivision (c)(3) in the headings for their argument, in which they state: "The trial court erred by failing to enjoin . . . the Resort's Violation of the Noise Ordinance," and "The trial court improperly refused to apply the 50 foot limitation of section 36.414(c)(3)" (Formatting omitted as to both quotations.) The plaintiffs do not otherwise express in this argument that they believe they are entitled to an injunction. We therefore glean from the headings that plaintiffs believe they are entitled to an injunction if this court determines that the trial court incorrectly interpreted Section 36.414, subdivision (c)(3).

the parties apparently did not focus on this phrase in the trial court, the inclusion of the phrase "prima facie" must serve *some* purpose in the ordinance. (See *Clements v. T. R. Bechtel Co.* (1954) 43 Cal.2d 227, 233 ["[E]very word, phrase and provision employed in a statute is intended to have meaning and to perform a useful function"].)

The Oxford English Dictionary defines "prima facie" as meaning, as an adverb, "[a]t first sight; on the face of it; as it appears at first without investigation," and, as an adjective, "[a]rising at first sight; based or founded on the first impression; (of evidence, etc.) acceptable unless contradicted." (OED Online. June 2016. Oxford University Press. <http://www.oed.com/view/Entry/151264?redirectedFrom=prima+facie> (accessed Aug. 12, 2016).) Further, consistent with these definitions and as commonly used in the law, the use of the phrase "prima facie" often refers to the creation of a *presumption*, as opposed to a definitive determination. For example, "[a] statute providing that a fact or group of facts is prima facie evidence of another fact establishes a rebuttable presumption." (Evid. Code, § 602; see also *In re Raymond G.* (1991) 230 Cal.App.3d 964, 972 [" 'The words "prima facie" mean literally, "at first view," and a prima facie case is one which is received or continues until the contrary is shown and can be overthrown only by rebutting evidence adduced on the other side' "].)

Giving the phrase "prima facie" in Section 36.414, subdivision (c)(3) its usual meaning, it is reasonable to construe Section 36.414, subdivision (c)(3) as creating a rebuttable presumption that operating, using, or playing a sound producing or reproducing device at a level that "is plainly audible at a distance of 50 feet or more from the building, structure or vehicle in which it is located" constitutes a violation of Section

41

36.414, subdivision (c)(2)(A).[18] This presumption can be rebutted by evidence demonstrating that the use of a sound producing or reproducing device at a volume that is plainly audible more than 50 feet from the source does not "disturb[ ] the peace, quiet and comfort of persons of normal sensitivity residing in the area."

As we explain in the following section, after considering all of the evidence, the trial court concluded that the noise emanating from the sound system utilized on the Resort's Croquet Lawn during its hosted outdoor events, when examined under the objective standard set forth in Section 36.414, subdivision (a), did *not* constitute the making or causing to be made a noise in a manner that would be disturbing to persons of normal sensitivity. Consequently, even if we were to assume that plaintiffs' proffered interpretation of the meaning of the term "structure" as used in Section 36.414, subdivision (c)(3) is the more reasonable interpretation, we would nevertheless conclude that any error on the trial court's part in interpreting Section 36.414, subdivision (c)(3) was harmless, given that, as we explain below, the trial court properly analyzed and applied Section 36.414, subdivision (a) of the "General Noise Prohibitions," (some capitalization and boldface omitted) which makes it unlawful for someone to make a "disturbing, excessive or offensive noise" (i.e., which makes it unlawful to do *by any means* what Section 36.414, subdivision (c)(2)(A) makes it unlawful to do by use of a device for producing or reproducing sound).

---

[18]    Significantly, the ordinance does not state that "it shall be a violation" or that "it shall be a per se violation" to use or play a device at a volume that is plainly audible more than 50 feet away from where the device is located.

42

3. *The trial court considered relevant factors identified in Section 36.414, subdivision (a); the trial court did not err in its application of this provision of the Noise Ordinance in assessing whether plaintiffs were entitled to an injunction with respect to their claim for private nuisance*

Plaintiffs contend, in essence, that the trial court ignored the "general noise prohibitions" in Section 36.414, subdivision (a), and instead focused on whether the noise generated by the Resort during its outdoor functions met the 50 decibels per hour average noise measurements level set forth in Section 36.404. Plaintiffs argue that the trial court inappropriately focused on the level of noise generated by the Resort's outdoor festivities held on the Croquet Lawn, even though "the *level* of noise is only one of a list of 10 nonexclusive factors to be considered when determining whether noise from any source, mechanically produced or not, violates [S]ection 36.414."

As plaintiffs point out, the factors listed in subdivision (a) of Section 36.414 include (1) the level of noise; (2) whether the noise is usual or unusual; (3) whether the origin of the noise is natural or unnatural; (4) the level of ambient noise; (5) any proximity of the noise to a place where someone sleeps; (6) the nature and zoning of the area from which the noise emanates and where it is heard; (7) the time of day the noise occurs; (8) its duration; (9) whether the noise is recurrent, intermittent or constant; and (10) whether the noise is produced by a commercial or noncommercial activity. (§ 36.414, subd. (b).)

Despite plaintiffs' complaints about the trial court's lack of consideration of factors other than the level of the noise, the court explained that in a case such as this, in which the plaintiffs' "fundamental complaint is not about the nature of the noise or the time of

43

day, but rather that the amplified sounds — voices and music — are simply too loud," the other factors on the list in Section 36.414, subdivision (b), are not as relevant as evidence concerning the volume of the noise. Thus, because plaintiffs' complaint is, at its core, based on the *level* of noise generated by the Resort, the trial court appropriately placed due emphasis on that factor in assessing whether that noise violated the Noise Ordinance.

Further, it is clear from a review of the trial court's thorough statement of decision that the trial court did, in fact, consider, and mention, a great number of these other factors in reaching its determination that the noises generated from the Croquet Lawn— noises that "otherwise comply with the General Sound Level Limits of the County Noise Ordinance," were not " 'disturbing, excessive or offensive' within the meaning of section 36.414." For example, the trial court considered the nature of the noise, noting that the sounds were comprised of "music, voices, applause, and laughter," none of which is unusual or unexpected. The court also noted the evening events concluded at 10:00 p.m., so that "it cannot be said that these sounds extend beyond a reasonable hour." The court took into consideration the fact that the noise from the Croquet Lawn events took place intermittently, on more than 30 occasions between early 2013 and the issuance of the court's statement of decision on February 2, 2015. Further, the court considered the effect of ambient noise on the level of noise in general in the area, including bird noise, sprinklers, and aircraft. The court also noted that Linda experienced and took notes regarding the ambient noise, including traffic and vehicle noise, barking dogs, screeching coyotes, and even events occurring on other neighboring properties. The court considered all of these factors, in addition to its finding regarding the *level* of noise—i.e.,

44

that "at no time did Croquet Lawn events hosted by Rancho Valencia generate noise exceeding the statutory limit."

It is thus clear that the trial court considered a variety of the factors outlined in Section 36.414, subdivision (b) in making its determination that the noise emanating from the Resort's property during events on the Croquet Lawn did not violate the objective standards set forth in either Section 36.414, subdivision (a) (which incorporates the objective standard included in the definition of a " '[d]isturbing, excessive or offensive noise' " found in Noise Ordinance, § 36.402, subd. (g)) or Section 36.414, subdivision (c)(2)(A) (which itself includes an objective standard, in that the noise must "disturb[ ] the peace, quiet and comfort of persons of normal sensitivity").

Secondarily, plaintiffs also suggest that because the trial court referred to plaintiffs' neighbors' testimony at trial as being that they "were disturbed by the noise from the events on the Croquet Lawn," the court made a "finding" that "mandates a ruling in favor of [plaintiffs]" because it demonstrates that the noise *was* " 'disturbing, excessive or offensive' " in violation of Section 36.414, subdivision (c)(2)(A). However, the trial court did not make a finding that the noise from the Croquet Lawn had, in fact, disturbed the peace, quiet and comfort of the neighbors and that these neighbors are persons of normal sensitivity. Rather, the trial court's comments regarding plaintiffs' neighbors were made in noting that *in contrast to Linda*, who seemed quite disturbed by the noise from the Resort, the testifying neighbors, and even Linda's husband, Angel, were not nearly as disturbed by the noise as Linda was. Further, the court ultimately concluded that these individual's subjective expressions of their displeasure with the sounds from events held

45

on the Croquet Lawn did not necessitate a finding that those sounds were *objectively unreasonable*. The trial court personally visited both the Resort and plaintiffs' property during one such event, and compared both the court's observations and the objective sound measurements from that event with Linda's notes from the evening and her subjective experience of the noise. In addition, the trial court listened to pre-selected recordings of events proffered by plaintiffs, and considered the objective sound measurements from a number of events other than the event on the evening of the court's site visit. Based on all of this evidence, the court made a specific finding that Linda "is more sensitive than most," and that she "is not the 'person of normal sensitivity' described in section 36.414 of the County Noise Ordinance." The court also made a finding that even though the "noise from Croquet Lawn events is clearly audible to the Mendezes and other neighbors in the surrounding area," it is "not unreasonably disturbing within the meaning of the County Noise Ordinance."

The trial court's findings are entitled to deference, given that the court "review[ed] . . . all the evidence including its first-hand observations during the September 27 event." Based on this evidence, the court could reasonably find that the sounds coming from the Resort a few evenings a month did not amount to a violation of Section 36.414, subdivision (a). The fact that some of plaintiffs' neighbors testified that they had at times been bothered by noise coming from outdoor events at the Resort did not require a different conclusion.[19] As the trial court noted, "[t]his is one of those situations, so common in discussions of legal philosophy, where reasonable minds can differ. It is not unreasonable for someone . . . to retire for the evening before 10:00 p.m. It is similarly not unreasonable for people . . . to value their solitude and to prefer the sounds of nature to those associated with human habitation. . . . Others find music and laughter, in moderation and at a reasonable hour, pleasant, or at least not disturbing." Given all of the evidence, the trial court reasonably determined that it "cannot conclude that noise levels from the Resort that otherwise comply with the General Sound Level Limits of the County Noise Ordinance are nonetheless 'disturbing, excessive or offensive' within the meaning of section 36.414."

IV.

DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to respondent.

---

19      Indeed, none of plaintiffs' neighbors joined in plaintiffs' lawsuit, nor initiated a lawsuit themselves to enjoin events on the Resort's Croquet Lawn.

                                                    AARON, J.

WE CONCUR:

BENKE, Acting P. J.

IRION, J.

Filed 9/13/16

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ANGEL L. MENDEZ et al., Individually and as Trustees, etc., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> RANCHO VALENCIA RESORT PARTNERS, LLC, <br><br> Defendant and Respondent. | D067899 <br><br><br> (Super. Ct. No. 37-2012-00053798-CU-PO-NC) <br><br><br> ORDER CERTIFYING OPINION FOR PUBLICATION |

THE COURT:

The opinion in this case filed August 26, 2016 was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to California Rules of Court, rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

BENKE, Acting P. J.

Copies to:  All parties