Filed 3/1/24

<u>CERTIFIED FOR PARTIAL PUBLICATION*</u>


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA


SECOND APPELLATE DISTRICT


DIVISION FOUR


| | |
|---|---|
| RICHARD C. COLYEAR, | B308382 |
| Petitioner and Respondent. | (Los Angeles County Super. Ct. No. BS150539) |
| v. | |
| ROLLING HILLS COMMUNITY ASSOCIATION OF RANCHO PALOS VERDES et al., | |
| Plaintiffs and Appellants. | |


     APPEAL from a judgment of the Superior Court of Los Angeles County, Christopher K. Lui, Judge.  Affirmed in part and reversed in part.

---

*     Pursuant to California Rules of Court, rules 8.1105(c) and 8.1110, this opinion is certified for publication with the exception of parts B through E of the Discussion.

Horvitz & Levy, David M. Axelrad, John A. Taylor, Jr.; Kaufman, Dolowich & Voluck, Richard C. Greenberg, Samantha F. Lamberg, and Michael J. Weinberger, for Plaintiffs and Appellants.

Greenberg Glusker Fields Claman & Machtinger, Ricardo P. Cestero; Chuck & Tsoong, Stephen C. Chuck; Greines, Martin, Stein & Richland, Kent L. Richland, David E. Hackett, and Stefan C. Love, for Petitioner and Respondent.

_____

The Rolling Hills Community Association of Rancho Palos Verdes (the Association) appeals the judgment in favor of Richard C. Colyear on his claim for declaratory relief, an injunction, and damages for breach of fiduciary duty arising out of the Association's tree-trimming covenant. Colyear cross-appeals the denial of his claim for quiet title. In the published portion of this opinion, we affirm the judgment as to the claim for declaratory relief. In the unpublished portion of the opinion, we affirm the judgment as to Colyear's claim of quiet title and reverse with respect to the claims for injunctive relief, breach of fiduciary duty against the Association, and the attorney fees award against the Association's individual directors.

**FACTUAL BACKGROUND**

In the mid-1930s, the Palos Verdes Corporation (PVC) acquired a large portion of the Palos Verdes Peninsula and began subdividing Rolling Hills. The community was envisioned as a place where residents could enjoy country living and was extolled for its views. Beginning in 1936, PVC carved out its first tract and

recorded a declaration of covenants and restrictions regarding that section. Over the years, PVC annexed more tracts, each with its own declaration. Although the original tract and many subsequent tracts contained covenants permitting the Association to trim trees on properties to preserve views, some did not.

As the years passed, trees grew, and view preservation became an issue in the community. Richard C. Colyear owned two parcels outside the original tract with a large garden containing many mature trees. Because the annexation declaration covering his property contained no tree-trimming covenant, Colyear preemptively initiated this action to obtain, among other things, a declaration and injunction that the trees on his property could not be cut.

The trial court agreed with Colyear, relying on *Citizens for Covenant Compliance v. Anderson* (1995) 12 Cal.4th 345 (*Citizens*). In *Citizens,* our Supreme Court held a covenant in a declaration establishing a general plan for a subdivision is binding on property within the subdivision if it is recorded before the execution of the contract of sale, describes the property, and states that it is to bind purchasers, even if the covenant is not in the deed. *Citizens* makes clear, however, that its ruling applies to properties described in the declaration at the time of sale because the owners, by their purchase, impliedly assent to the covenant's terms. Because the tree-trimming covenant was not recorded against Colyear's property when he purchased it, the court found he did not impliedly agree to the covenant's terms.

## A.    Background of Rolling Hills Development

PVC acquired Lot "H," part of the old Rancho Palos Verdes, in 1926.  Most of the Palos Verdes Peninsula was contained within Lot "H," including what is now the City of Rolling Hills.

Rolling Hills is a planned community.  At the time of its inception, there were no trees in Rolling Hills, with every lot enjoying a panoramic view of Santa Monica Bay and the local mountains.  Rolling Hills had large lots which offered the "ideal outdoor life, seclusion, privacy, recreation, horseback riding, cultivation of fruits and vegetables[,] and the enjoyment of a country atmosphere, all protected by good restrictions."  (Hanson, *Rolling Hills, The Early Years* (1978) p. 24.)  As further described by the Association's attorney in the 1940s, "[PVC's] project in these hills contemplate[d] a community development of refinement, contentment, rural composure, security, privacy and isolation . . . ."

In 1936, the Association was incorporated with five volunteer directors.

## B.    Recordation of Declaration 150

The first phase of the development was initiated with the recordation of Declaration 150 on May 14, 1936.  Declaration 150 stated that PVC "certifies and declares that it has established and does hereby establish the General Plan for the protection, maintenance, improvement[,] and development" of the land described in it.  The General Plan set forth "the general basic and local restrictions, conditions, covenants, reservations, liens and charges upon and subject to which all lots, parcels and portions of said property shall be held, leased or sold and/or conveyed."

4

Declaration 150 contained a metes and bounds description of its boundaries, and it only covered a portion of Rolling Hills.

Declaration 150 authorized the Association to interpret and enforce its provisions and the provisions of "any subsequent declaration." (See Declaration 150 Art. I, § 4, Art. II, § 2, subd. (p), Art. IV, § 11.) Any landowner likewise could enforce the General Plan against other owners. Declaration 150 stated, "[A]ny lot owner subject to the jurisdiction of the Association" may seek an abatement of a violation of any other lot owner of any restrictions, condition, or covenant in this declaration. (Art. IV, § 12.)

Article IV, section 5 of Declaration 150 provided for the annexation of future tracts. Such annexed tracts would be "subject to restrictions, conditions, covenants, reservations, liens, or charges set forth in a Declaration of Restrictions." Upon the recording of such declarations, "the Association shall then and thereafter have power to do and perform any and all of the acts, to fix, impose and collect charges, assessments and dues from the owners of said property as therein provided[,] and to grant said owners membership in the Association as therein agreed to and provided."

Article II, section 2 of Declaration 150 provided that the Association's powers extended to any property and owner in its jurisdiction and, according to appellants, reflects PVC's intent to extend the General Plan to the entire Rolling Hills community.

The Tree-Cutting Covenant (Tree CC) is contained in Article I, section 11 of Declaration 150, which provided in relevant part: "The Association shall have the right at any time to enter on or upon any part of said property for the purpose of cutting back trees or other plantings which, in the opinion of the Association, is

5

warranted to maintain and improve the view of, and protect, adjoining property."

A.E. Hanson, the first general manager of PVC, recalled in his memoir *Rolling Hills, The Early Years, supra* at page five, that at the time of development, all of Rolling Hills was put "under general basic restriction" when Declaration 150 was signed.

## C.  Annexation of Additional Tracts Under Separate Declarations

Over the years, additional tracts were annexed. Today, Rolling Hills consists of 57 tracts, each added by its own numbered declaration and agreement with PVC. In 1937, PVC annexed the first additional tract with Declaration 150-A. Declaration 150-A expressly stated it was subject to the same restrictions and conditions as Declaration 150. Another area, referred to as the "Flying Triangle," was added in 1939 with Declaration 160. From 1941 to 1944, additional tracts were added, governed by Declarations 150-B through 150-F. These declarations contained the same Tree CC as Declaration 150.

In January 1944, the Board of the Association adopted a Resolution allowing it to record agreements for the declaration of covenants in conformity with Declaration 150.[1] The Resolution provided that the Association could, "from time to time, [ ] execute and deliver, and cause to be recorded in the office of the County Recorder of the County of Los Angeles, an agreement between this [A]ssociation and [PVC] for the declaration of establishment of basic restrictions, conditions, covenants, reservations[,] liens, charges and certain local restrictions in conformity with said Declaration No. 150, . . . ."

---

[1]     A similar resolution was adopted in 1949.

6

Declaration 150-M, applicable to Colyear's property, was recorded on May 29, 1944, and does not contain the Tree CC. In 1967 and 1970, Colyear purchased his parcels at 35 and 37 Crest Drive. This land is not within the boundaries described in Declaration 150. Neither Colyer's title insurance policies nor his deeds contain a reference to Declaration 150; rather, the title insurance reports reference Declaration 150-M. Currently, Colyear's property has many mature trees and a large garden.

## D.    Inconsistencies Result in the 1947 Swaffield Study

Roland Swaffield, an attorney and Rolling Hills resident, prepared a study in 1947 regarding inconsistencies between Declaration 150 and the annexation declarations. Swaffield observed that there were questions concerning the scope and applicability of the various declarations, and there was a "wide divergence of these restrictions in many instances."

In conjunction with this report, Swaffield produced an analysis of the differences in the restrictions, with particular emphasis on Declaration 150-AF. Declaration 150-AF is identical to Declaration 150-M in its preamble and in its omission of the Tree CC. Swaffield's analysis observed that in the tract governed by Declaration 150-AF, "the Association would not have the same power concerning these subjects" discussed in the omitted sections "as it possesses in relation to the original Rolling Hills area under Declaration 150." In November 1947, Swaffield asked Kelvin Vanderlip, PVC president, why the Tree CC (codified in section 11), among other sections, had been omitted from Declaration 150-AF.

Vanderlip responded that PVC intentionally removed those provisions: "[P]ractically all of the provisions which were contained

in Declaration No. 150, . . . were removed by our attorneys as far back as the Flying Triangle Declaration [(Declaration 160)] for the purpose of simplification." Vanderlip stated that PVC would not "object to the modification of [Declaration 150-AF]" to conform it to Declaration 150.

In 1948, after evaluating possible modifications to the declarations, a draft modification was prepared, adding the Tree CC to Declaration 150-AF. The parties intended to use this modification as a model for other declarations in order to bring various parcels into conformity with Declaration 150. A Master Agreement was prepared in 1950 to update the annexation template. However, the parties realized that modifying the declarations would require 70 percent concurrence of Association members. The modifications never took place, and no modified declarations were ever recorded.

Later declarations, those recorded from 1949 through 1969, included the Tree CC.

## E.      *Russell v. Palos Verdes Properties* (1963) 218 Cal.App.2d 754 (*Russell*)

There are a number of cases involving covenants, some concerning covenants in Rolling Hills specifically. *Russell,* a case predating *Citizens,* involved Rolling Hills subdivision restrictions requiring neighborhood association permission before subdividing any parcel. (*Russell*, *supra*, 218 Cal.App.2d. at p. 757.) *Russell* held that personal covenants, which do not run with the land, may be enforced against transferees acquiring the property with actual or constructive notice[2] of the restrictions when the property was

_____

[2]      Proper recordation of a real property instrument is necessary to impart constructive notice of its contents. (Civ. Code, §§ 1213, 1214.)

8

conveyed to them, when failure to enforce the restrictions would produce an inequitable result.  (*Id.* at pp. 762–764.)

Although its holding is not on point here, *Russell* made various non-binding observations about the interplay between Declaration 150 and the subsequent annexation declarations.  At issue in *Russell* was Declaration 150-W.[3]  (*Russell, supra*, 218 Cal.App.2d at p. 765.)  *Russell* observed that Declaration 150 created "a general plan of restrictions."  When PVC sold subsequent parcels, "before conveying the same and for the future use of the land," PVC "imposed on each the above restrictions in the form of separate Agreements and Declarations between it and [the] Association."  (*Id.* at p. 758.)  *Russell* further observed that the declarations applicable to the parcels that were sold (Declarations 150-A through 150-V) were intended to establish a general plan for the development, improvement, and protection of the subdivision.  (*Id.* at p. 759.)  With Declaration 150-W's reference to the General Plan in Declaration 150, *Russell* indicated the land it annexed into Rolling Hills became "subject to the same restrictions."  (*Id.* at p. 765.)

William Kinley, the Association's counsel at the time of the *Russell* decision, relied on the decision to assert that "all parcels in Rolling Hills are subject to [Declaration] 150 because of the reasoning in the *Russell* case" and "everybody was covered" by the

---

If an instrument cannot be located by searching the "grantor" and "grantee" indices of the public records, the instrument does not constitute constructive notice and later bona fide purchasers or encumbrances are not charged with knowledge of its existence.  (See *Stafford v. Ballinger* (1962) 199 Cal.App.2d 289, 297.)

[3]      Declaration 150-W's simplified restrictions list also omits the Tree CC.

General Plan. Kinley believed *Russell* established that "all of the Declarations of Restrictions were to be considered as a part of Declaration [ ] 150" and "not as separate and independent declarations of restrictions." Nonetheless, Kinley informed his successor, Sidney Croft, who became the Association's attorney in 1988, that different restrictions had been placed on different tracts.

## F. *Citizens for Covenant Compliance v. Anderson* (1995) 12 Cal.4th 345 (*Citizens*)

In *Citizens*, our Supreme Court held that a declaration of restrictions for a subdivision need not be cited in a parcel's deed to be effective if certain conditions were met. (*Citizens, supra,* 12 Cal.4th at p. 349.) *Citizens* required that the declaration be recorded before the execution of the contract of sale, *describe the property it is to govern*, and state that it is to bind all purchasers and their successors. (*Ibid.*, italics added.) *Citizens* denounced the "crazy-quilt pattern" of restrictions that resulted from a contrary rule, which occurred when "the developer of a subdivision records a uniform plan of restrictions intended to bind and benefit every parcel alike," but "implementation of the plan depends upon the vagaries of the actual deeds, and whether they contain at least a ritualistic reference to restrictions of record." (*Id*. at pp. 360–363.) *Citizens* reasoned that "if the restrictions are recorded before the sale, the later purchaser is deemed to agree to them . . . even if there is no additional reference to them in the deed." (*Id*. at p. 363.)

G. ***Nunn v. Rolling Hills Community Association of Rancho Palos Verdes*** **(Super. Ct. Los Angeles, 2004, No. BC314522) (*Nunn*)**

In *Nunn,* the superior court rejected the contention that a parcel subject to Declaration 150 could claim exemption from its Tree CC provisions because the party seeking to enforce those provisions against it was not so encumbered.

*Nunn* involved two adjacent homeowners who disputed whether the Tree CC applied to their property. The Lorigs, who were uphill to the Nunns, sought to have the Association trim the Nunns' trees, but the Nunns sought an injunction to prevent the trimming. The Nunns' property was within the original boundaries of Declaration 150, while the Lorigs' property was outside the boundaries of Declaration 150 but within Declaration 150-AE. Declaration 150-AE did not contain the Tree CC.

The court observed that the General Plan provision authorizing the Tree CC was contained in a declaration by PVC (through Declaration 150) when it owned "what is now the Nunn property and the Lorig property. Said provision is contained in documents in the chain of title of the Nunn property but is not contained in a conveyance or document in the chain of title of the Lorig property."

The Nunns argued that while the Tree CC was in their chain of title, the Tree CC was not in the Lorigs' chain of title such that the covenant lacked mutuality and could not be enforced against them. The court disagreed and found the Nunns were bound by the Tree CC because it was "contained in a declaration that describes the Nunn property, was recorded before the Nunn property was sold, states that it is to bind all purchasers and their successors and was recorded to give subsequent purchasers

11

constructive notice of it. . . .  The Nunns . . . had constructive notice that trees upon their property might be trimmed to maintain the view of, and protect, adjoining property."  As a result, the court denied the Nunns' request for preliminary injunction. The Nunns' writ petition was summarily denied by this court.

**H.     Subsequent Resolutions Attempt to Correct View Impairment Provisions**

Given the inconsistencies and uncertainties regarding the enforceability of view restrictions, beginning in the 1990s, as trees had matured, residents complained that Rolling Hill's blank canvas had become an area of "obscene landscaping."  Responding to community support for view protection, the Association attempted to create conformity among the divergent declarations.

The Association adopted several resolutions as follows:

Resolution 166.  This resolution, adopted in 1997 and drafted by Croft, permitted any Rolling Hills resident to apply for the Association to exercise its tree-trimming authority to correct view impairments.  Resolution 166 does not distinguish between parcels that have a Tree CC and those that do not.

Resolution 181.  In 2002, the Association limited view impairment correction to cases involving mutuality of deed restrictions.  The resolution adopted a policy accepting applications only when "the applicant and the affected parcel are subject to the same Deed Restrictions."

The Association opted to require mutuality of deed restrictions to reduce litigation with those who, like Colyear, objected to having the Tree CC applied to their property.  Colyear wrote to the Association in July 2002, informing the Association that his property was covered by Declaration 150-M.  He asked

12

whether the Association asserted the Tree CC was enforceable against his property, and the Association responded, "No. You are one of the few 'miscellaneous' parcels who are not protected."

Resolution 193. In response to the *Nunn* litigation, Croft advised that the Tree CC need not be in the chain of title to be binding. Croft asserted that Declaration 150's Tree CC applied to all properties in the Association's boundaries.

In 2006, Resolution 193 was issued. It stated that Declaration 150 applied to "some, if not all" properties in Rolling Hills. Resolution 193 required that the object of the view complaint be subject to the Tree CC. But, as amended in 2009, this resolution permitted any owner to file an application.

Resolution 220. This June 2012 resolution replaced Resolutions 166, 181, and 193. Recognizing the Tree CC applied to "some, if not all, properties in the City of Rolling Hills," it stated it was the Association's "policy to encourage resolution of view impairment issues between the parties who are directly involved." The resolution permitted any property owner to file a view application, regardless of the owner's governing declaration.

## PROCEDURAL BACKGROUND

### A. Petition and Complaint

This action originated in 2015, when a neighbor of Colyear filed a view application under Resolution 220 against another neighbor. However, two of Colyear's trees appeared in a photograph of the view application, so Colyear preemptively sued the neighbor as well as the Association and several of its board members to enjoin them from cutting his trees, for declaratory relief that the Tree CC did not apply to his property, and for quiet title and breach of fiduciary duty against the board and

13

Association. The neighbor successfully challenged Colyear's lawsuit as a SLAPP action, but the action proceeded against the remaining defendants. (*Colyear v. Rolling Hills Community Association of Rancho Palos Verdes* (2017) 9 Cal.App.5th 119, 123, 137.)

After several intermediate proceedings, Colyear filed his operative Third Amended Petition and Second Amended Complaint in June 2018, stating claims for declaratory relief, injunctive relief, quiet title, slander of title, and breach of fiduciary duty against the Association and the director defendants.[4] Colyear sought to enjoin the Association from relying on Resolution 220 and Declaration 150 to trim trees on his property and a declaration that Declaration 150 did not apply to his property.

## B.    Trial and Statement of Decision

After the trial court granted defendants' motion for summary adjudication on the slander of title claim,[5] the matter proceeded to a 10-day bench trial held in September 2019.

Colyear principally argued that restrictions can only burden the property legally described in the restricting document, and because Declaration 150 only described one tract, under *Citizens,* it did not burden his property. The Association argued that

---

[4]    In addition to the Association, the operative petition named the Board of Directors of the Association; Board members David McKinnie, Joseph Heitzler, Gian Starinieri, Marcia Gold, Tom Heinsheimer, and Fred Lorig; and non-board member Yu Ping Liu.

[5]    Before trial, on July 23, 2019, Colyear dismissed without prejudice individual director defendants Gold and Heinsheimer, and on August 15, 2019, dismissed Starinieri.

14

*Citizens* supported its position because Declaration 150 was in Colyear's chain of title through Declaration 150-M, and reasonable inquiry would have put Colyear on notice that Declaration 150's general restrictions, including the view covenant, applied to his property. The Association also argued it had treated Declaration 150 as the General Plan from the beginning and its interpretation of the General Plan was conclusive.

The trial court issued its Corrected Statement of Decision and entered judgment on September 4, 2020.

In its statement of decision, the court identified the issue as whether Declaration 150 was binding on properties *other than those* identified therein. The court rejected the Association's contention that *Russell* established the governing effect of Declaration 150 over the entire community. The court distinguished *Russell* on the basis it did not address the Tree CC, did not address inconsistent provisions among the various recorded declarations, and assumed for purposes of the case before it the declarations were the same. As a result, the court found *Russell* provided no support for the Association's argument that Declaration 150 was binding across the entire community.

The trial court also conducted a linguistic analysis of Declaration 150-M. The court concluded Declaration 150-M did not incorporate Declaration 150's terms sufficiently to impart notice that Declaration 150 applied to properties governed by Declaration 150-M. Further, extrinsic evidence, including the 1944 resolution, the Swaffield study, as well as the Hanson book, confirmed that Declaration 150 was not drafted to apply clearly and unambiguously outside its boundaries. Further, the abortive attempts of the Association over the years to modify or amend the

15

annexation declarations showed that the Association was aware of the inconsistencies.

Lastly, the trial court concluded *Citizens* did not compel a different result. *Citizens* held that where a common plan for a subdivision is recorded before the properties in a subdivision are sold, all properties in the subdivision are bound, even where the deed or other documents pertaining to the sale do not mention the restrictions. However, Declaration 150 was not a stand-alone plan that expressly applied to all of Rolling Hills at the time Colyear purchased his home. Additionally, the CC&Rs in *Citizens* were recorded on the subject property, while Declaration 150 was not recorded on Colyear's property. Thus, no "uniform plan of CC&Rs was ever imposed during the expansion of the community, as the Swaffield analysis showed years before [Colyear] purchased [his property]." The trial court observed, "To the extent a crazy quilt exists, it is a byproduct of the method by which PVC and [the Association] expanded the community."

The trial court granted Colyear's request for declaratory relief and an injunction, declaring that Declaration 150 was not binding on Colyear's property except to the extent any restrictions were restated in Declaration 150-M. The court enjoined the Association from enforcing or attempting to enforce the Tree CC against Colyear's property and from "publishing or disseminating in any statements or documents, including internet website content, indicating that the [Tree CC] applies to or may be enforced against the [s]ubject [p]roperty." The court found the Association breached its fiduciary duty to Colyear, but denied Colyear's quiet title claim, finding it unwarranted and "redundant" given the injunction and declaratory relief. The court

16

also entered judgment in favor of the individual defendants on the fiduciary duty claim.[6]

On February 25, 2021, the court awarded $1.328 million in attorney fees to Colyear under Civil Code section 5975.

## DISCUSSION
**A. Applicability of the Tree CC to Colyear's Property**

1. *Standard of Review*

We analyze deeds under the same rules applicable to contracts. (*Canyon Vineyard Estates I, LLC v. DeJoria* (2022) 78 Cal.App.5th 995, 1003.) "Contract interpretation is a question of law." (*Ibid*.) "'The fundamental goal of contract interpretation is to give effect to the mutual intention of the parties.'" (*Ibid*; see Civ. Code, § 1636; *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264.) When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible. (Civ. Code, § 1639.) "The words of a contract are to be understood in their ordinary and popular sense." (Civ. Code, § 1644; see *Lloyd's Underwriters v. Craig & Rush, Inc.* (1994) 26 Cal.App.4th 1194, 1197–1198 ["We interpret the intent and scope of the agreement by focusing on the usual and ordinary meaning of the language used and the circumstances under which the agreement was made"].) The whole of the contract is "'to be taken together, so as to give effect to every part, if reasonably practicable,'" and to avoid a construction "that would render other provisions surplusage." (*Boghos v. Certain Underwriters of Lloyd's of London*

---

[6]	In so ruling, the trial court found the petition for writ of mandate superfluous. The court reasoned that, although there was no basis for the Association to enforce the Tree CC, issuance of writ relief was unnecessary because the claims for declaratory and injunctive relief accomplished this purpose.

17

(2005) 36 Cal.4th 495, 503 (*Boghos*); see *R.W.L. Enterprises v. Oldcastle, Inc.* (2017) 17 Cal.App.5th 1019, 1026 (*R.W.L. Enterprises*) [an interpretation giving "'effect to all provisions of the contract is preferred to one which renders part of the writing superfluous, useless or inexplicable'"].)

Extrinsic evidence is admissible to prove a meaning to which the contract is reasonably susceptible. (*Powers v. Dickson, Carlson & Campillo* (1997) 54 Cal.App.4th 1102, 1111.) If the trial court decides, after receiving the extrinsic evidence, the language of the contract is reasonably susceptible to the interpretation urged, the evidence is admitted to aid the interpretation. (*Ibid.*) Thus, "[t]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." (*Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37.)

The threshold issue of whether to admit the extrinsic evidence—that is, whether the contract is reasonably susceptible to the interpretation urged—is a question of law subject to de novo review. (*Appleton v. Waessil* (1994) 27 Cal.App.4th 551, 554–555.) Here, because the material facts are undisputed, the legal significance of those facts presents a question of law which we review de novo. (*Hill v. San Jose Family Housing Partners, LLC* (2011) 198 Cal.App.4th 764, 774.)

2.     *Declaration 150 Does Not Apply to Colyear's Property*
         a.     *Under* Citizens*, Declaration 150 Does Not*
                *Burden Colyear's Property Because His Property*
                *is Not Described in It*

"A covenant running with the land is created by language in a deed or other document showing an agreement to do or refrain from doing something with respect to use of the land." (*Committee to Save The Beverly Highlands Homes Assn. v. Beverly Highlands Homes Assn*. (2001) 92 Cal.App.4th 1247, 1269.) The only covenants that run with the land are those specified by statute "and those which are incidental thereto." (Civ. Code, § 1461.) The primary characteristic of a covenant running with the land is that its benefits and burdens pass with the transfer of the estate. (*Self v. Sharafi* (2013) 220 Cal.App.4th 483, 488.)

*Citizens* described the requirements for the formation of covenants and held that where CC&Rs are recorded before the sale of any property in a subdivision, *describing the property they govern*, subsequent purchasers who have constructive notice of the recorded CC&Rs are deemed to have agreed to be bound by such restrictions, even where such restrictions are not mentioned in any deed or other document. (*Citizens, supra,* 12 Cal.4th at p. 349, italics added.) *Citizens* found it was not merely the intent of the original grantor that established the covenant; there must be sufficient intent on the part of the purchaser to enter the covenants. "Although notice is relevant to our resolution of the issue, it is not the issue itself." (*Id*. at p. 356.) Rather, there must be sufficient evidence of the grantee's intent to accept the covenant. (*Id*. at pp. 356, 365–366.)

As *Citizens* made clear, the covenant comes into existence upon sale or transfer of the property. "In essence, if the

19

restrictions are recorded before the sale, the later purchaser is deemed to agree to them.  The purchase of property [with] know[ledge] of the restrictions evinces the buyer's intent to accept their burdens and benefits.  Thus, the mutual servitudes are created at the time of the conveyance even if there is no additional reference to them in the deed." (*Citizens*, *supra*, 12 Cal.4th at p. 363.)  *Citizens* concluded, "[T]he rule is consistent with the rationale that a covenant requires an agreement between buyer and seller, and not a unilateral action by the developer." (*Id.* at p. 367.)  In other words, the parties' intent is inferred from the recorded uniform plan: "It is express on the part of the seller, implied on the part of the purchaser. . . ." (*Id.* at p. 366.)

 *Citizens* examined two cases for guidance: *Werner v. Graham* (1919) 181 Cal. 174 (*Werner*) and *Riley v. Bear Creek Planning Committee* (1976) 17 Cal.3d 500 (*Riley*).  In both cases, covenants were recorded by developers seeking to impose a general plan, but the developers failed in their efforts for different reasons.  In *Werner,* the developer subdivided a parcel and recorded a map but did not record any other documents indicating any restrictions. (*Werner*, *supra*, at p. 177.)  The developer in *Riley* sold the property in dispute by deed that contained no restrictions, but nine months after the conveyance, the developer recorded a document purporting to impose uniform restrictions on a number of lots, including the one in dispute. (*Riley*, *supra*, at p. 504.)  In both *Werner* and *Riley*, the Supreme Court held the properties were not bound by the restrictions.  In *Werner*, there was no recorded document imposing uniform restrictions on the entire subdivision, only individual deeds imposing restrictions on specific parcels.  In *Riley*, the restrictions were recorded after the conveyance at issue.

20

Here, applying the rule recognized in *Citizens* and its rationale, we conclude the Tree CC of Declaration 150 does not apply to Colyear's property. First, it is undisputed that Declaration 150 does not describe Colyear's property, as required by *Citizens*. This requirement defines the scope of the buyer's implied agreement to any covenant binding the described property. As originally set forth, Declaration 150 covered the narrow strip down the middle of Rolling Hills. In later years, as PVC expanded the Rolling Hills development, additional declarations were made, including Declaration 150-M governing Colyear's property. Neither Colyear's deeds nor his title reports reference Declaration 150, but they reference Declaration 150-M. As a result, under *Citizens,* Colyear did not impliedly agree to be bound by a covenant set forth in Declaration 150.

b. *The Association's Arguments*

Acknowledging that Declaration 150 does not expressly apply to Colyear's property, the Association advances several theories to extend the Tree CC to Colyear's property: (1) Declaration 150-M's references to Declaration 150 and the General Plan incorporate the basic restrictions of Declaration 150; (2) these references provide constructive or inquiry notice that the Tree CC in Declaration 150 applies to lands annexed under Declaration 150-M; (3) the extrinsic evidence at trial established that PVC intended to incorporate Declaration 150's terms into Declaration 150-M; (4) under the *Nunn* and *Russell* cases, the Tree CC should apply; (5) Resolution 220 makes the Tree CC applicable; and (6) because Colyear benefits from using Association property, he bears the corresponding burden of

21

complying the Tree CC in Declaration 150.  These arguments are unpersuasive.

>(1)    *Declaration 150-M Does Not Incorporate Declaration 150's Terms*

The Association argues that references to Declaration 150 in Declaration 150-M are sufficient to incorporate the Tree CC into Declaration 150-M.  We disagree.

We turn to contract principles for guidance.  A contract may incorporate the terms of another contract.  (*Shaw v. Regents of the University of California* (1997) 58 Cal.App.4th 44, 54.)  However, the reference to the other contract or its terms must be clear and unequivocal.  "'"[T]he reference must be called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties."  [Citation.]'"  (*Ibid.*)  Further, the terms of the contract must be sufficiently certain in order to provide a basis for determining the existence of a breach and for giving an appropriate remedy.  (*Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 811.)  As a corollary, we will not write the parties' contract for them.  (*Industrial Indemnity v. Superior Court* (1990) 224 Cal.App.3d 828, 832.)

In this case, Declaration 150-M does not sufficiently incorporate the Tree CC found in Declaration 150.  First, unlike other declarations such as Declaration 150-A, Declaration 150-M does not expressly incorporate the restrictions found in Declaration 150; to the contrary, the General Basic Descriptions in Declaration 150-M duplicate some of Declaration 150's General Basic Restrictions and omit others.  Second, while Declaration 150-M acknowledges that Declaration 150 exists, nowhere is there clear and unequivocal incorporation of Declaration 150 or

22

its Tree CC. For example, the first reference to Declaration 150 is to its separate location by Map and Book number. Declaration 150-M also refers to PVC's "General Plan" and the Association's power to interpret and enforce covenants imposed on tracts covered by Declaration 150, but this simply recites the Association's powers as to tracts covered by Declaration 150. It does not state that Declaration 150's covenants apply to tracts covered by Declaration 150-M. Finally, Declaration 150-M provides that under Article IV, section 5 of Declaration 150, PVC can annex more tracts to be governed by Declarations that are to be later recorded. That is what occurred here: Colyear's property was annexed, and Declaration 150-M was recorded to govern it. These references are not sufficiently clear, unequivocal, or certain to incorporate Declaration 150's Tree CC into Declaration 150-M.

> (2) *Declaration 150-M's References to Declaration 150 Did Not Otherwise Make the Tree CC Applicable to Colyear's Property*

The terms of Declaration 150, including the Tree CC, were not recorded against Colyear's property. Nevertheless, the Association asserts that the references to Declaration 150 in Declaration 150-M were sufficient to put Colyear on constructive or inquiry notice that the Tree CC applied to his property. According to the Association, Colyear should have inquired as to what Declaration 150 said, analyzed the competing declarations, and reached the conclusion that the Tree CC applied to his property. The Association asserts, under *Citizens*, this is sufficient to enforce the Tree CC against his property, even though the covenant is not in the chain of title. We disagree.

23

As a preliminary matter, the references to Declaration 150 in 150-M did not put Colyear sufficiently on constructive or inquiry notice of the applicability of the Tree CC. Constructive notice of a lien, covenant, or other interest in property arises from the proper recording of that interest. (Civ. Code, § 1213; *Vasquez v. LBS Financial Credit Union* (2020) 52 Cal.App.5th 97, 108.) Civil Code section 1213 provides that "every conveyance of real property . . . recorded as prescribed by law [provides] constructive notice of its contents [ ] to subsequent purchasers." (See Civ. Code, § 1215.) A purchaser has inquiry notice where the purchaser "'has knowledge of circumstances which, upon reasonable inquiry, would lead to that particular fact.'" (*In re Marriage of Cloney* (2001) 91 Cal.App.4th 429, 437; see Civ. Code, § 19.) As we have discussed, Declaration 150-M did not incorporate Declaration 150 by reference and Declaration 150 was not otherwise recorded against Colyear's property. Even if Colyear had reviewed Declaration 150, given the property description therein, he could have concluded it applied to a different section of Rolling Hills. This conclusion would have been confirmed by the Association in 2002 when it stated the Tree CC was not enforceable against his property.

Moreover, *Citizens* does not stand for the proposition that a purported covenant outside the chain of title can be enforced whenever there is a development with a common grantor. Although PVC is the common grantor of the Rolling Hills parcels, it conveyed different parcels under different declarations. As *Citizens* makes clear, a covenant is created by implied agreement, which occurs with the recordation of the original declaration on property and its acceptance through conveyance to a subsequent purchaser. "'The burden should be upon the developer to insert

24

the covenant into the record in a way that it can be easily found' and '[a]ll buyers could easily know exactly what they were purchasing.'" (*Citizens, supra,* 12 Cal.4th at p. 365.) The recordation should be such that a title search reflects the operative declaration. (*Ibid.*) Then, when a conveyance is made subject to that declaration, the buyer can be deemed to have consented to it. Here, it is undisputed that the original declaration recorded on Colyear's property, 150-M, did not contain the Tree CC. Thus, under *Citizens*, Colyear cannot be deemed to have accepted the Tree CC.

### (3) *Extrinsic Evidence of PVC's Intent*

The Association argues the trial court erred in ignoring its extrinsic evidence of PVC's intent to have a uniform General Plan that would include tree-trimming covenants for every property in the development. We disagree that such evidence must be considered in defining the scope of the covenant. *Citizens* demonstrates the intent that matters is what is expressed in writing in the recorded predecessor documents describing the property to be bound. (*Citizens, supra,* 12 Cal.4th at p. 366*.)* PVC did not bring its intended General Plan to fruition by recording the necessary documents in conformity with *Citizens* on Colyear's property. As explained in *Werner* and *Citizens*, the sole intent of the common grantor, the original owner, is insufficient. There must be joint intent between the grantor and the grantees. Further, *Riley* rejected parol evidence to show that the parties in fact intended the property to be subject to restrictions like those later recorded, finding that the covenants must be in writing to be effective. (*Riley, supra*, 17 Cal.3d at p. 509.) A contrary rule "would make important questions of the title to real estate largely

dependent upon the uncertain recollection and testimony of interested witnesses." (*Id.* at p. 510.)

### (4) *Nunn* and *Russell*

To the extent the Association attempts to rely on *Nunn* and *Russell* to contend the Tree CC applies to Colyear's property, both cases are distinguishable. *Nunn* addressed two properties, one with the Tree CC and the other without it, and did not decide the issue whether the Tree CC applied to the entire community regardless of the language in the individual declarations. *Russell* did not decide the applicability of the Tree CC. As our analysis based on *Citizens* makes clear, *Russell's* commentary on the scope of the General Plan and Declaration 150 is only dicta. (*Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1158 [an appellate decision is not authority for everything said in the court's opinion but only for the points involved and actually decided].)

### (5) *Resolution 220*

The Association argues Resolution 220 provides an independent basis to enforce the Tree CC. Resolution 220 permitted any property owner to file a view application, regardless of the owner's governing declaration. Resolution 220 only provides a mechanism for filing a view application to resolve tree-trimming disputes. It is not a covenant.

>  (6) *Colyear's Use of Association Common Areas is Not Inconsistent with Our Conclusion*

Finally, the Association asserts that because Colyear enjoys the benefits of Rolling Hills' roads, gates, and other facilities, he should be subject to all intended restrictions, including the Tree CC. The Association generally argues that it would be unfair to allow him to enjoy the benefits of common areas without subjecting him to the burden of the Tree CC. To the extent this argument posits that only properties subject to the original Declaration 150 may use the common areas, it is mistaken. The Association's Articles of Incorporation establish that the common areas are governed by the Association "for the benefit of residents of any tract" and as may be set forth in any subsequent declaration for such tract. As we have discussed, there is no declaration applicable to Colyear's property that includes the Tree CC.

>  c. *Declaration 150-M's Tree-Trimming Provisions Do Not Provide an Independent Basis to Trim Colyear's Trees*

The Association asserts certain provisions of Declaration 150-M (Art. II, § 2, subds. (u), (j), and (v))—independent of Declaration 150's General Plan—provide the authority for it to enter Colyear's property and trim trees for any purpose, including view protection. Colyear asserts the Association did not raise the issue at trial, and in any event, the Association's tree-trimming power is limited to streets, parks, playgrounds, school grounds, and adjacent land.

27

Declaration 150-M, Article II, section 2, subdivision (u) permits the Association to trim trees under certain circumstances: The Association has the power "[t]o care for, trim, protect, plant and replant trees, shrubs, or other planting on streets, parks, playgrounds, school grounds, or upon any property over which it may have and/or assume control or jurisdiction and/or on any property adjoining the same." Article II, section 2, subdivision (j) grants the Association the authority to "provide for light [and] air . . . for the occupants of existing and/or hereafter erected buildings by establishing such regulations as are usually included in city housing codes or zoning regulations." Finally, Article II, section 2, subdivision (v) authorizes the Association to "care for, trim, protect and plant or replant any vacant or private property it may assume charge of and to make a reasonable charge therefor."

We need not determine whether the Association sufficiently raised the issue at trial because these provisions do not give the Association power to trim trees on any and all private property within the Association's boundaries. By its plain language, subdivision (u) governs plants in public places: streets, parks, playgrounds, and school grounds. To the extent subdivision (u) also refers to "any property over which [the Association] may have and/or assume control and jurisdiction and/or on any property adjoining the same," this language must be read in context. It refers to the Association's ability to attend to plantings found on the types of property the Association may control that are similar to the public property specifically identified. In some instances, the Association's plantings could naturally encroach on adjoining properties, in which case, subdivision (u) would arguably allow the Association to cut them back. But subdivision (u) cannot be construed beyond the terms it encompasses. (See *Eisen v.*

28

*Tavangarian* (2019) 36 Cal.App.5th 626, 644 [ejusdem generis limits general word following specific word to those of like kind].)

To interpret subdivision (u) as the Association proposes would render the Tree CC mere surplusage, as the Association could use subdivision (u) to trim trees found anywhere on any private property. PVC would not have relied upon vague language at the end of a provision governing public spaces to establish a significant right to enter an individual homeowner's property and cut their trees. (See *Boghos*, *supra*, 36 Cal.4th at p. 503; *R.W.L. Enterprises*, *supra*, 17 Cal.App.5th at p. 1026.)

The Association's arguments regarding subdivisions (j) and (v) are also unavailing. The language in these provisions is also too general to encompass the Association's specific right to enter private property and trim trees. Subdivision (j) deals with the Association's ability to make light and air regulations "as are usually included in city housing codes or zoning regulations" and contemplates view preservation regulations regarding future construction. This language cannot reasonably be construed to give the Association the authority to enforce the Tree CC on property not otherwise encumbered by it. (*Epic Communications, Inc. v. Richwave Technology, Inc.* (2015) 237 Cal.App.4th 1342, 1348–1349 [language must be reasonably susceptible to interpretation "urged by the party"].) For the same reason, subdivision (v) cannot be extended in the manner the Association argues. Subdivision (v) concerns the care of vacant or private property of which the Association takes charge, not private property generally, including property actively managed by its owner. Finally, as with subdivision (u), if subdivisions (j) and (v) are interpreted as the Association proposes, they render the Tree

29

CC mere surplusage.  (See *Boghos*, *supra*, 36 Cal.4th at p. 503; *R.W.L. Enterprises*, *supra*, 17 Cal.App.5th at p. 1026.)

**B.    Scope of Injunctive Relief\***

The Association contends the injunctive relief granted by the trial court is overbroad, constitutes a prior restraint on speech, and should not include the individual director defendants. Colyear counters that the Association, as well as the individual board members, have asserted the Tree CC applies throughout the area governed by the Association, and thus, prior restraint is appropriate.

The judgment contains two injunctions.  The judgment on the declaratory relief claim enjoins "all Defendants" and anyone "acting in concert with them . . . from enforcing, or attempting to enforce, the [Tree CC] against [Colyear's property]."  The judgment on the injunctive relief claim enjoins all defendants from "publishing or disseminating in any statements or documents, including internet website content, indicating that the [Tree CC] applies to or may be enforced against the [s]ubject [p]roperty."

1.    *Governing Law*

A permanent injunction is a determination on the merits that a plaintiff has prevailed on a cause of action and that equitable relief is appropriate.  (*Art Movers, Inc. v. Ni West, Inc.* (1992) 3 Cal.App.4th 640, 646.)  The grant or denial of a permanent injunction rests within the trial court's sound discretion and will not be disturbed on appeal absent a showing of a clear abuse of discretion.  (*Mendez v. Rancho Valencia Resort Partners, LLC* (2016) 3 Cal.App.5th 248, 260.)  A permanent

---

\*    See footnote, *ante*, page 1.

30

injunction, notwithstanding its discretionary component, must be sufficiently supported by the evidence of record. (*DVD Copy Control Assn., Inc. v. Kaleidescape, Inc.* (2009) 176 Cal.App.4th 697, 721.) If the evidence is insufficient to justify issuance of a permanent injunction, the trial court had no discretion to issue the injunction. (*Ibid.*)

"'[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights.' [Citation.]" *(DVD Copy Control Assn., Inc. v. Bunner* (2003) 31 Cal.4th 864, 886.) A prior restraint describes judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur, and permanent injunctions "are classic examples of prior restraints." (*Ibid.*) However, "[a]lthough stated in broad terms, the right to free speech is not absolute." (*Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 133–134.) Indeed, "'there are categories of communication and certain special utterances to which the majestic protection of the First Amendment does not extend because they "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality."'" (*Balboa Island Village Inn, Inc. v. Lemen* (2007) 40 Cal.4th 1141, 1147 (*Lemen*).)

Injunctive relief may be applied to repetition of expression that has judicially been determined to be unlawful. (*Lemen, supra,* 40 Cal.4th at p. 1153.) However, an injunction's scope is overbroad where the conduct enjoined is not likely to recur in the future. (*Scripps Health v. Marin* (1999) 72 Cal.App.4th 324, 332–333.)

2.      *The Order Enjoining Future Speech*

Here, substantial evidence does not support a finding the Association (or its board members) have expressed outside of litigation that the Tree CC applies to Colyear's property.  As reflected in its response to Colyear's July 2002 letter, the Association has at times asserted the Tree CC did *not* apply to his property.  While this confusion led Colyear to institute this action preemptively after joining third-party litigation between neighboring homeowners, it does not show the Association (or its board members) repeatedly asserted Declaration 150 and the Tree CC applied to Colyear's property.  Moreover, the trial court's ruling the Tree CC does not apply to Colyear's property makes it unlikely the Association will publicly state otherwise in the future.  As such, the injunction is not supported by sufficient evidence and therefore constitutes an abuse of discretion.

3.      *The Order Enjoining Future Attempts of Enforcement*

The order enjoining "all Defendants" and those acting in concert with them from enforcing, or attempting to enforce, the Tree CC against Colyear's property does not enjoin speech.  Thus, it is subject to a different analysis.  Appellants do not contest entry of the injunction prohibiting the enforcement of the Tree CC against Colyear's property as a general proposition but argue instead that the declaratory relief injunction is overbroad because only the Association itself need be enjoined.

Appellants cite no applicable authority to show it is an abuse of discretion to enjoin all defendants and those working in concert with them.  It is well settled that an entity, as well as those through which it acts, may be subject to an injunction. (*Berger v. Superior Court* (1917) 175 Cal. 719, 721 [injunction

32

applies to the classes of persons through whom the enjoined person may act, such as agents, servants, employees, aiders, abettors, etc., though not parties to the action]; accord, *Signal Oil & Gas Co. v. Ashland Oil & Refining Co.* (1958) 49 Cal.2d 764, 779 [injunction against the corporation is injunction against the directors, acting in their capacity as directors].)[7]  As there is no showing the trial court abused its discretion by enjoining the Association, the individual directors, and those acting in concert with them, the declaratory relief injunction is affirmed.

## C.      Breach of Fiduciary Duty Claim

The Association contends the breach of fiduciary duty claim must be reversed because Colyear suffered no damages, as attorney fees do not constitute proper damages for breach of fiduciary duty.  The Association also contends the directors acted in good faith in enforcing the CC&Rs, and because they cannot be individually liable, the Association itself cannot be liable.  Colyear responds that the trial court's findings necessarily establish harm because the court enjoined the Association from further breaches and good faith does not excuse the Association's breach.  We conclude the claim fails due to a lack of damages.

### 1.      *Relevant Background*

At trial, the Association asserted it acted in good faith pursuant to the business judgment rule (Corp. Code, § 7231) and

---

[7]      Although the Federal Rules of Civil Procedure are not applicable in this case, we note the court used language similar to that found in rule 65.  Rule 65 states that an injunction can include the parties, "the parties' officers, agents, servants, employees, and attorneys," and "other persons who are in active concert or participation" with the parties. (Fed. Rules Civ. Proc., rule 65.)

on reliance of counsel. The trial court agreed as to the actions of the individual board members, citing *Biren v. Equality Emergency Medical Group, Inc.* (2002) 102 Cal.App.4th 125, 137 (*Biren*) [business judgment rule protects even misinformed, misguided and mistaken directors who were well-meaning].

However, the court found the Association could be found liable apart from its individual board members on the rationale that even where the board members are protected by the good faith exception, a homeowner should not be without a remedy against the board. (See *Ritter & Ritter, Inc. Pension & Profit Plan v. The Churchill Condominium Assn.* (2008) 166 Cal.App.4th 103, 125 (*Ritter*).) The court found the Association liable because it adopted a community-wide view policy (Resolution 220) without a valid basis in the applicable declarations.

With respect to damages, the trial court found that while Colyear's property would suffer a loss in value if the trees were cut, he had neither attempted to sell his property nor was he dissuaded from doing so because of the Tree CC. Thus, there was no indication of past damages for diminution in value. Due to the injunctive and declaratory relief, there was no evidence supporting present or future damages. Although the court believed attorney fees could be recovered as damages at the time it entered its corrected statement of decision, there was no evidence presented at trial of such fees. Nonetheless, the court upheld the Association's liability for breach of fiduciary duty on the apparent basis Colyear might be awarded attorney fees.

On September 21, 2020, Colyear filed a separate, noticed motion for attorney fees pursuant to Civil Code section 5975. The trial court granted the fees in an order entered February 25, 2021.

34

2.      *Colyear Has Failed to Establish Damages*

The three elements of the cause of action for breach of fiduciary duty are: existence of a fiduciary relationship, breach of fiduciary duty, and damages. (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820.) The directors of the Association are fiduciaries who must act for the benefit of the corporation and its members. (*Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490, 513 [directors of nonprofit corporations are fiduciaries who are required to exercise their powers in accordance with the duties imposed by the Corporations Code].)

A homeowner's association and its board members may also be protected from liability under two theories: (1) a rule of judicial deference to their decision-making and (2) the business judgment rule. We need not consider these theories or whether the Association can be liable without underlying liability of its individual directors, as Colyear has failed to establish damages.

The trial court found no diminution in value of Colyear's property. Absent evidence Colyear attempted to sell his property or was dissuaded from doing so because of the Tree CC, we discern no evidence of past damages for diminution in value. As a result of the declaratory relief action, there was also no evidence supporting present or future damages through enforcement of the Tree CC. The trial court posited, "[T]he only other form of recoverable damages on this claim would be a recovery of attorney's fees" but found "no sufficient evidence of expenditures [for legal fees] or their reasonableness was presented at trial."

The Association points out attorney fees are not awardable as damages in tort actions, including claims for breach of fiduciary duty. The Association challenges the trial court's finding that such fees can be recovered as damages for Colyear's breach of

fiduciary duty claim. (*Gray v. Don Miller & Associates, Inc*. (1984) 35 Cal.3d 498, 507.) We agree with the Association that attorney fees do not constitute damages for purposes of Colyear's breach of fiduciary duty claim. (See *Garcia v. Santana* (2009) 174 Cal.App.4th 464, 473.) The availability of such fees under Civil Code section 5975 (the Davis-Stirling Common Interest Development Act) for an action between a homeowner association and an owner does not convert attorney fees into damages for purposes of establishing tort liability. Rather, such fees are available to ensure access to the courts. (See *Garcia v. Santana, supra,* at p. 473.) We note that the trial court did not find sufficient evidence of the total attorney fees claimed at trial in any event.

Colyear contends entry of equitable relief establishes the requisite harm in his breach of fiduciary duty claim, which "logically" flows from the Association's breach given the years he spent opposing any application of the Tree CC to his property. We disagree.

Colyear sought declaratory relief, which is available to any party "who desires a declaration of his or her rights or duties with respect to another . . . ." (Code Civ. Proc., § 1060.) "'Declaratory relief operates prospectively, serving to set controversies at rest before obligations are repudiated, rights are invaded or wrongs are committed. Thus[,] the remedy is to be used to advance preventative justice, to declare rather than execute rights. [Citations.]' In essence, declaratory relief operates to declare future rights, not to address past wrongs." (*Monterey Coastkeeper v. California Regional Water Quality Control Bd., etc.* (2022) 76 Cal.App.5th 1, 13.) As Colyear's declaratory relief action did not "'address past wrongs,'" it did not establish the requisite proof of

36

actual damages or harm for purposes of his breach of fiduciary duty claim.

In addition, the issuance of the injunction to prevent future damage from occurring did not constitute "damages" for purposes of a breach of fiduciary duty claim. An injunction is designed to maintain the status quo. (*Daly v. San Bernardino County Bd. of Supervisors* (2021) 11 Cal.5th 1030, 1040–1041.) Here, none of Colyear's trees had been trimmed by or because of the Association. While any injunction would prevent future harm, it did not prove there were damages to support the breach of fiduciary duty claim.

## D. We Reverse the Attorney Fees Award Against the Individual Directors

The Association asserts the attorney fees award against its individual directors should be reversed because Civil Code section 5975's fee-shifting provision does not apply to individual directors shielded by the business judgment rule. Colyear urges us to affirm the award because the statute authorizes awards against individual defendants generally, if not individual directors. He argues that because he is seeking to hold the individual defendants liable as property owners and not directors, the business judgment rule does not protect them. We agree with the Association's argument.[8]

The trial court awarded the reduced amount of $1,328,391.04 in attorney fees against all defendants pursuant to Civil Code section 5975. Section 5975 provides in relevant part that covenants and restrictions "may be enforced by any owner of

---

[8] In light of our conclusion, we do not address the Association's alternative argument that Colyear was not the prevailing party against its individual directors.

a separate interest or by the association, or by both" (Civ. Code, § 5975, subd. (a)), and in an action "to enforce the governing documents [of a common interest development], the prevailing party shall be awarded reasonable attorney[ ] fees and costs" (Civ. Code, § 5975, subd. (c)). Civil Code section 5980 provides that an association entity, not its individual directors, has standing to prosecute such enforcement actions on its behalf. (Civ. Code, § 5980.)

We construe sections 5975 and 5980 together as authorizing an award of attorney fees against the Association and not its individual directors. (See *Poole v. Orange County Fire Authority* (2015) 61 Cal.4th 1378, 1385 [statutory provisions must be read together].) Subdivision (a) of section 5975 applies only to an "association" or to "owners," and does not specifically apply to individual board members. Reading sections 5975 and 5980 together, they indicate that if an owner, such as Colyear, brings an enforcement action against an association, the association may be liable for attorney fees; they do not indicate that individual directors of the Association should also be liable for them.[9]

Colyear argues he is not seeking to hold the individuals liable for attorney fees as directors, as he recognizes they might

---

[9]     Cases cited by Colyear do not indicate otherwise. Each illustrates that when an association brings an enforcement action against a property owner for improper improvements or leasing, the prevailing party may seek attorney fees. (See, e.g., *Rancho Mirage Country Club Homeowners Ass'n v. Hazelbaker* (2016) 2 Cal.App.5th 252, 260; *Almanor Lakeside Villas Owners Assn. v. Carson* (2016) 246 Cal.App.4th 761, 765.) They do not hold individual directors of an association liable for attorney fees.

38

be shielded from liability under the business judgment rule.[10] Instead, Colyear contends he is seeking to hold each director defendant liable as a property owner. In this regard, Colyear asserts the individual owners should be held liable for attorney fees because they have "expressed the view" the Tree CC applies to his property. This is not enough. Section 5975 contemplates awarding attorney fees to enforce a covenant by a landowner or an association. Colyear has made no allegation the individual board members acted in their capacity as landowners seeking to enforce the Tree CC, and the trial court made no such finding. As such, they are not liable for attorney fees under section 5975.

## E.    Colyear's Cross-Appeal

In his cross-appeal, Colyear contends the trial court abused its discretion in denying his quiet title claim because he established each element of the claim as a matter of law. Moreover, Colyear contends the trial court could not decline to issue a quiet title judgment on the basis it was redundant in light of the declaratory relief judgment. The Association responds that the trial court properly exercised its discretion to fashion

---

[10]    As Colyear acknowledges, section 7231 of the Corporations Code provides that individual directors are generally shielded from liability for performing their duties in good faith under the business judgment rule. The rule sets up a presumption that directors' decisions are based on sound business judgment and can be rebutted only by a factual showing of fraud, bad faith, or gross overreaching. (*Eldridge v. Tymshare, Inc.* (1986) 186 Cal.App.3d 767, 776.) Implicit in this rule is that directors of non-profit boards would have little incentive to volunteer for service if they faced great risk of liability for doing so. (See *Ritter, supra,* 166 Cal.App.4th at p. 121.) Here, the trial court found that the individual defendants were shielded from liability for breach of fiduciary duty under the business judgment rule.

appropriate relief, no prejudice was shown by the failure to enter a quiet title judgment, and Colyear provides no record citation to show an adverse claim. We conclude an adverse claim to title was not sufficiently shown and find no abuse of discretion.[11]

### 1. *Relevant Background*

The trial court found Colyear failed to meet his burden to prove an adverse claim against the property sufficient to warrant a judgment quieting title. The court observed, "[Colyear] presents a novel issue in that he seeks to quiet title . . . against adverse claims that do not arise from any document recorded in his chain of title . . . ." The court indicated the Association's failure to properly record such a claim was the very basis for finding the Tree CC inapplicable to Colyear's property. As a result, the court found a quiet title judgment would "unnecessarily complicate the chain of title." In light of the declaratory judgment and permanent injunction, the court also found a quiet title judgment would be "redundant and confusing." The court declined to exercise its discretion to issue a quiet title judgment.

### 2. *Discussion*

A quiet title action is generally equitable in nature and seeks to declare the rights of the parties in realty. (Civ. Proc.,

---

[11] We deny appellants' motion to strike portions of Colyear's cross-appellant's reply brief and their accompanying request for sanctions. To the extent Colyear's combined brief raises arguments or issues for the first time in his combined brief, we shall ignore those arguments as beyond the scope of his cross-appeal. (See *Doe v. University of Southern California* (2016) 246 Cal.App.4th 221, 252, fn. 16; *Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 268.)

§ 760.010 et seq.; *Strauss v. Summerhays* (1984) 157 Cal.App.3d 806, 812.)  To establish a claim to quiet title, the plaintiff must establish an "adverse claim" to the property.  (Civ. Proc., § 760.020, subd. (a).)  Such claim must also affect title to the property.  (*West v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780, 802–803.)  The object of the action is to finally settle and determine all conflicting claims to the property in controversy, and to decree to each such interest or estate therein as each may be entitled.  (*Robin v. Crowell* (2020) 55 Cal.App.5th 727, 740.)  Quiet title judgments operate in rem and are therefore binding not only against the parties to the quiet title proceeding, but also "'against all the world.'"  (*Nickell v. Matlock* (2012) 206 Cal.App.4th 934, 944.)

We review the trial court's decision for abuse of discretion. The court's discretion to issue a quiet title judgment must be exercised within the bounds of governing statutes and must be guided by applicable legal principles.  (*Farmers Ins. Exchange v. Superior Court* (2013) 218 Cal.App.4th 96, 106.)  The question of whether a trial court applied the correct legal standard to an issue in exercising its discretion is a question of law.  (*Gonzalez v. Munoz* (2007) 156 Cal.App.4th 413, 420–421.)  We review any disputed facts for substantial evidence.  (*Ridec LLC v. Hinkle* (2023) 92 Cal.App.5th 1182, 1195.)

Colyear asserts a judgment quieting title is required as a matter of law, and the trial court abused its discretion in declining to quiet title because the Association asserted an "'interest in property' adverse to Mr. Colyear's title."  We disagree.  Colyear has cited no case establishing entitlement to quiet title where the purported adverse claim is a covenant that is both inapplicable to the plaintiff's property and does not put plaintiff's title at stake.

41

(See *West v. JPMorgan Chase Bank, supra,* 214 Cal.App.4th at pp. 802–803 [quiet title failed where defendant had no "adverse claims to title"].)  Neither Colyear's deeds nor his title reports reference Declaration 150.  Rather, they reference Declaration 150-M.  In other words, Colyear does not demonstrate how arguing that a covenant applies to a property affects title where review of the chain of title itself proves the covenant does not apply.  As this was the basis on which the trial court declined to exercise its equitable discretion to issue a quiet title judgment, Colyear has not demonstrated error.

Nevertheless, Colyear asserts that where a plaintiff shows *any* adverse claim, the plaintiff is entitled to have the validity of that interest declared by the court through quiet title.  The cases upon which he relies are inapposite, as they involved claims that, unlike the inapplicable Tree CC, affected the plaintiff's title.  In *Peterson v. Gibbs* (1905) 147 Cal. 1, the plaintiff claimed to be the fee simple owner of property.  (*Id.* at pp. 2–3.)  The defendants "denied that [the] plaintiff was the owner in fee or in possession of any part of said land," based upon a duly recorded instrument that the court found valid.  In *Barker v. Barker* (1956) 139 Cal.App.2d 206, the parties disputed whether property was separate or community property and asked the court to determine who had title to it in their dissolution proceeding.  (*Id.* at pp. 210–211.)[12] Here, there is no dispute Colyear has title to his property and no

---

[12]     Colyear also relies on *Water for Citizens of Weed California v. Churchwell White* (2023) 88 Cal.App.5th 270, in support of his position. In that case, the court addressed a quiet title claim regarding water rights in the context of a malicious prosecution action and concluded the plaintiff had probable cause for bringing such a claim.  (*Id.* at p. 284.)  This case does not establish that a non-existent covenant created a cloud on title sufficient to constitute an "adverse claim."

42

document is recorded in the chain of title applying the Tree CC to Colyear's property. As Colyear has not shown how the trial court abused its discretion by failing to act within the bounds of the law, we affirm its decision on the quiet title cause of action.

## DISPOSITION

The judgment of the superior court is affirmed with respect to declaratory relief and quiet title claims.  The judgment is reversed with respect to the injunctive relief and breach of fiduciary duty claims.  The attorney fees award is vacated, and the court is directed to enter a new order awarding attorney fees to Colyear against the Association.  The parties are to bear their own costs on appeal.

MORI, J.

We concur:

COLLINS, Acting P.J.

ZUKIN, J.